THE MISSOURI PACIFIC RAILROAD COMPANY v. NEL-
LIE JOHNSON.

No. 13,761.   (77 Pac. 576.)

SYLLABUS BY THE COURT.

1. RAILROADS — *Injury to Employee — Question for Jury.*
Whether an engineer who, while he was under his engine looking
for a hot box, was killed by the impact of some cars which had
been kicked up a grade and then had rolled back against his en-
gine, was guilty of contributory negligence, barring a recovery, by
placing himself in a position of danger at the time and place and
under the circumstances, was a question for the jury.

2. NEGLIGENCE—*Not Necessary to Be on Guard at All Times.*
Negligence is not imputable to a person for failing to guard
against accident when, under the circumstances, he had no rea-
son to apprehend danger.

Error from Anderson district court; C. A. SMART,
judge.   Opinion filed July 7, 1904.   Affirmed.

*Waggener, Doster & Orr*, for plaintiff in error.

*C. W. Trickett*, and *J. P. Trickett*, for defendant in
error.

The opinion of the court was delivered by

ATKINSON, J.: On the night of December 27, 1900,
W. E. Johnson, an employee of the Missouri Pacific
Railway Company, was killed in the switch-yards at
Coffeyville, Kan., while in the discharge of his duties
as engineer of a switch-engine.   He left a widow and
one child, and the widow brought this action to re-
cover damages, charging that his death was the result
of negligence of the railway company.   She had ver-
dict and judgment for the sum of $7000, and the com-
pany brings error.

In the city of Coffeyville are two switch-yards, one
known as the Missouri Pacific yards, the other as the

46—69 KAN.

Iron Mountain yards, both operated by the plaintiff in error. They are connected at the west end by a Y, and the portion of this Y which leads from the main track southeast into the Iron Mountain yards forms a very perceptible grade, dipping to the westward. Johnson was killed at about the hour of 10 : 30 p. m. The night was dark, cold, and windy, and he was a new man in the yards, having operated the switch-engine there the two preceding nights only. The local freight from Osawatomie had just pulled into the yards. By direction of the foreman of the switching crew, the switch-engine operated by Johnson moved forward and was coupled to the rear end of the caboose of this train, consisting of twenty-seven cars. This string of cars which had formed the local freight was then backed westward over the main line until it passed the switch opening onto the Y leading to the Iron Mountain yards. The switch having been lined, a signal was given to Johnson to move forward, it being given in a manner to indicate that cars would be cut off. Johnson moved the engine forward, pushing the string of cars onto the Y and up the grade. As this was being done the east twelve cars were cut off, and the signal was given to Johnson to stop and back with the remaining fifteen cars attached to the engine. It was left to McElrath, a member of the switching crew, to follow up and stop the cut of twelve cars and prevent their rolling back down the grade. When the signal was given Johnson did not immediately stop the engine and attached cars; and did not back. He said to his fireman, Zubar : "I smell waste burning ; I believe the right back-driver box is on fire." He lighted a torch and got down from the engine with it in his hand. After walking about the engine he stooped down, holding

the torch in his left hand, resting his right upon the rail, and looked up under the engine.   While in this position the twelve cars which had been cut off and left to move up the grade in charge of McElrath, rolled back down the grade, colliding with the cars attached to the engine, and causing it to move backward and over Johnson, killing him instantly.

The second amended petition contained two causes of action — the first charging a liability for negligence under the common law, and the second, under the statute.   When plaintiff rested her case, defendant interposed a demurrer to the evidence in support of each of the causes of action, and also moved that plaintiff be required to elect upon which cause of action she would rely for a recovery.   The court overruled the demurrers, and withdrew from the consideration of the jury all charges of negligence except the one charging negligence to McElrath on account of his failure to prevent the cut of twelve cars from rolling back down the grade, colliding with the standing cars, and causing the death of Johnson.

Defendant denied negligence on the part of McElrath, and charged negligence to Johnson contributing to, and causing, his death.   It was averred by it that the accident was caused by Johnson's negligence in the following particulars : (1) In not obeying the signals given him to stop and back; (2) in stopping the engine with fifteen cars on the grade, he at the time knowing the danger of the cut-off cars' running back against them; (3) in going under the engine at the time and under the circumstances then existing without giving notice or warning that he was about to do so; (4) in voluntarily and unnecessarily selecting a dangerous and unsafe way to do what he did, when there was a better and safer way which might

have been selected. It was further averred that Johnson had a full knowledge of all the conditions surrounding the business in which he was then engaged and the means of acquiring information of all the dangers and risks incident thereto, and that he assumed the risks and hazards as a part of his duties without objection or protest. The foregoing specifications of negligence were also urged as grounds upon which the court should have sustained defendant's demurrers to plaintiff's evidence, the overruling of which is assigned as error.

The switching crew with Johnson was composed of Wilson, the foreman of the crew, whose duty it was to lay out and direct the work; Murphy, one of the helpers, whose duty it was to cut off cars and throw switches; McElrath, also one of the helpers, the fieldman, whose duty it was to look out after, catch and stop cuts of cars; and Zubar, the fireman. Wilson and Murphy testified that signals to stop and to back were given to Johnson by means of a lantern at or about the time the twelve cars were cut off; that the signals were not answered or acted upon by him. There was no evidence to show that he saw or understood the signals given. There was testimony tending to show that Johnson, from his position on the engine, could not have seen the signals; and there was testimony tending to show that the signals given were confusing; that it was the duty of an engineer, upon receiving confusing signals, not to act on the the same, but await the giving of signals which he could understand. There was also competent evidence to the effect that when an engineer believed, as Johnson at the time expressed himself to his fireman, Zubar, as believing, that there was a hot box on his engine, it was his duty, at once and to the exclusion

of every other duty, to make an examination of his engine. There was also testimony of engineers that Johnson, in making the examination of his engine at the time and place, pursued the customary method.

Whether Johnson, before making an examination of his engine, applied the brakes, or whether he attempted to communicate by signals to the switchmen the fact that he was about to make such examination of his engine, is in doubt. He did not sound the whistle. If he signaled by the use of his torch it was not seen. When the collision came the fireman found the brakes not applied. He applied them and soon stopped the moving engine and cars. He stated that he did not know whether Johnson had applied the brakes before leaving the engine. There was evidence offered to show that the air-brakes, such as those with which this engine was equipped, would, when the air had been applied, automatically release themselves within the time intervening between Johnson's leaving his engine and the collision caused by the cars' rolling down the grade. There was evidence that one man could handle and control that number of cars on the grade of the Y, if attentive to the task, and the work of setting the brakes was taken in hand at the proper time; that one brake in good repair, set at the proper time, would have held this cut of cars.

Johnson was a new man in the yards and, while it is fair to presume he knew of the existence of the grade, there was no evidence to show that he had any knowledge that cars frequently rolled back down the grade when attended by a brakeman to control them. He had the right, under the circumstances, to assume that McElrath would discharge his duty, control the cars, and prevent their rolling back down the grade.

Negligence is not imputable to a person for failing to guard against accident when, under the circumstances, he had no reason to apprehend danger. (*Moulton v. Aldrich*, 38 Kan. 300.) There was evidence that Johnson, at the time and place, was discharging a necessary duty by the customary method. The facts shown were such that reasonable minds might differ with respect to the question whether he had acted as a reasonably prudent man under the circumstances would act. (*Beaver v. A. T. & S. F. Rld. Co.*, 56 Kan. 514, 43 Pac. 1136.) We cannot say, as a matter of law, that he was guilty of negligence contributing to his injury and death. The court committed no error in overruling defendant's demurrers to plaintiff's evidence. (*K. C. Ft. S. & G. Rld. Co. v. Foster*, 39 Kan. 329, 18 Pac. 285; *K. C. Ft. S. & G. Rld. Co. v. Cravens*, 43 id. 650, 23 Pac. 1044; *Rogers v. Hodgson*, 46 id. 276, 26 Pac. 732.)

Switchman McElrath, a witness for defendant, stated that when the cut of twelve cars was made, he followed them up the grade, overtook them, climbed on top of the cars, set the brakes on two of them, and was in the act of setting the brake on a third when they collided with the standing cars attached to the engine. He further stated that he had about succeeded in stopping the moving cars; that had Johnson stopped the cars attached to the engine at the time he was signaled to do so and not permitted them to move further up the grade, he (McElrath) could have stopped the twelve cars' rolling down the grade before they would have traveled to a point where the standing cars would then have been, and the collision with the standing cars thus have been avoided. Wilson and Murphy both stated that when they last saw McElrath before the collision he was following the

cut of twelve cars, endeavoring to overtake them; that when they first saw him after the collision he was on the ground beside these cars. They did not see him on them at any time. Greenup, an engineer who was on his engine close by where the cut of cars ran upon the grade, stated that there was no person on them as they passed. The cars were not subsequently found as McElrath stated that they were at the time he left them, nor were they found with the brakes set, as he stated. Gallagher, a witness for defendant and one of its car-repairers, stated that he examined the cars soon after the accident, found the brakes all in good repair, and the brake on the second car set.

Defendant also produced as witnesses its master mechanic and several engineers to establish that Johnson, in making the examination of his engine, had not pursued the safest course and had voluntarily placed himself in a place of great danger. The question of the negligence of McElrath in not preventing the cars' rolling down the grade, and the question of the negligence of Johnson in making the examination of his engine at the time and place and under the surrounding circumstances, were submitted to the jury upon conflicting evidence. The jury returned answers to 115 special questions submitted by defendant, covering all the material points in controversy. The answers returned were consistent with one another, were supported by the evidence, and upheld the general verdict. The jury specially found that there was negligence on the part of McElrath and that there was no negligence on the part of Johnson. They not only found negligence on the part of McElrath in not preventing the cars' rolling down the grade, but also found that he was never on the cut of twelve cars to set the brakes.

· It is urged that the risk that cars might roll back down the grade was one of those assumed by Johnson in his employment. This court has frequently held that the risks assumed by the servant by virtue of his employment are the ordinary risks and hazards incident to such employment. (*A. T. & S. F. Rld. Co. v. Wagner*, 33 Kan. 660, 7 Pac. 204; *St. L. Ft. S. & W. Rld. Co. v. Irwin*, 37 id. 701, 16 Pac. 146, 1 Am. St. Rep. 266.) He does not assume unusual risks and hazards — those risks and hazards not ordinarily incident to his employment and of which he has no knowledge. (*A. T. & S. F. Rld. Co. v. Schroeder*, 47 Kan. 315, 27 Pac. 965.) Johnson being a new man in the yards, and not having knowledge that cars attended by switchmen frequently rolled back down the grade, it cannot be said, as a matter of law, that this was one of the risks and hazards assumed by him in his employment. The question was properly submitted to the jury, and by their general verdict and special findings this proposition was determined against the defendant company.

The record in this case is voluminous. Much testimony was introduced upon the trial going to the questions of the negligence of McElrath and the contributory negligence of Johnson. The brief of plaintiff in error contains numerous assignments of error, most of which are based upon the refusal of the court to give the instructions requested and upon the instructions given. The latter fairly stated the law of the case, and there was no material error in refusing to give the instructions requested.

No prejudicial error being found in the record, the judgment of the district court will be affirmed.

All the Justices concurring.