Rosado, en Representación de su Hija, Demandante y Ape-
lante, v. Ponce Railway and Light Company, Deman-
dada y Apelada.

Apelación procedente de la Corte de Distrito de Ponce en
un caso sobre indemnización de daños y perjuicios.

No. 951.—Resuelto en junio 9, 1914.

Ley del Caso—Nuevo Juicio—Alcance de Dicha Doctrina—Cuestiones de
Hecho y de Derecho.—La doctrina de la ley del caso consistente en que lo
resuelto por el tribunal de apelación es de fuerza obligatoria para la corte
sentenciadora en un nuevo juicio y para el tribunal de apelación en un
segundo recurso, es aplicable a cuestiones de derecho, pero nó a cuestiones
de hecho.

Preponderancia de la Prueba—Significación de Dicha Frase—Apreciación
del Tribunal Sentenciador.—La preponderancia de la prueba no consiste
en la mera superioridad numérica de los testigos de una parte, sino en el
peso, crédito y valor que dé la corte a la totalidad de la evidencia aportada
por cada una de las partes. Sin embargo, si los testigos son de igual hon-
radez, candor, inteligencia y verdad, y están igualmente corroborados en
los otros extremos de sus declaraciones e igualmente libres de interés en el
pleito, entónces el mayor número determina la preponderancia. *Wilcox* v.
*Hines*, 100 Tenn., 542. En cuestiones de esta naturaleza, la apreciación de
la corte inferior será sostenida a menos que se demuestre que es claramente
errónea.

Testigos—Manifestaciones Favorables y Adversas—Apreciación del Tri-
bunal Sentenciador.—El hecho de declarar los mismos testigos de una
parte un detalle de un accidente que pueda ser favorable y otro que pueda
ser adverso a la causa de la parte que los presenta, no implica necesaria-
mente el que no sean dignos de crédito. Por el contrario tal hecho puede
apreciarse más bien como demostrativo de la verdad de sus manifestaciones
en ambos extremos.

Electricidad—Voltage Necesario para Ocasionar la Muerte—Apreciación
Errónea del Tribunal Sentenciador—Efectos Producidos por la Co-
rriente.—Si bien es verdad que no existe una regla fija sobre el número de
voltas necesario para producir la muerte de una persona, puede decirse que
dicho número debe ser más alto que el de 110, que se considera generalmente
inofensivo. Y cuando una corriente eléctrica produce el efecto de levantar
a un hombre robusto violentamente y arrojarlo sobre el balcón de una casa
contigua a la en cuyo frente se encontraba, sacudiéndolo fuertemente y
produciéndole como resultado quemaduras profundas en casi todo el cuerpo
y finalmente la muerte, es indudable que dicha corriente eléctrica era supe-
rior a 110 voltas y, por tanto, de mayor intensidad que la usualmente tras-
mitida para dar luz a las casas de vivienda, y al no apreciarlo así, cometió
error la corte sentenciadora.

NEGLIGENCIA DE LA DEMANDADA—RES IPSA LOQUITUR—MUERTE OCASIONADA POR LA ELECTRICIDAD.—Aplicando la doctrina de *res ipsa loquitur* al presente caso es necesario concluir que la muerte que se investiga ocurrió por haber permitido la demandada que por unos alambres que conducen generalmente una corriente de 110 voltas, pasara otra mayor capaz de ocasionar la muerte; correspondiendo a la parte demandada la prueba de que no fué con tal motivo negligente.

NEGLIGENCIA CONTRIBUTORIA—REPARADOR DE LÍNEAS—INSTRUCCIONES RELATIVAS AL USO DE ALAMBRES ELÉCTRICOS.—La instrucción dada en términos generales por el administrador de una compañía de teléfonos a sus empleados con respecto a que debían tener presente que todos los alambres eléctricos, eran peligrosos, no puede por sí sola hacer culpable de negligencia contributoria a uno de dichos empleados encargado de la reparación de la línea, si al encontrarse con un alambre tenía motivos bastantes para creer que no era peligroso.

ID.—DEFENSAS QUE DEBE PROBAR LA DEMANDADA.—La negligencia contributoria del demandante, es una defensa que incumbe alegar y probar al demandado.

ID.—ALCANCE DE LA DECISIÓN EN EL CASO DE DÍAZ *v.* THE SAN JUAN LIGHT AND TRANSIT COMPANY, 17 D. P. R., 69.—Debe fijarse de acuerdo con lo que en este de *Rosado* v. *Ponce Railway and Light Company,* se establece.

ID.—PELIGROS CONOCIDOS—CIRCUNSTANCIAS PARA QUE PUEDA IMPUTARSE NEGLIGENCIA CONTRIBUTORIA.—Para que pueda imputarse negligencia contributoria a una persona que se arriesga al peligro, es necesario que se arriesgue a sabiendas o con desconocimiento negligente y voluntaria e innecesariamente, sin que pueda imputarse dicha negligencia a una persona porque no investigue el peligro, si de acuerdo con las circunstancias del caso no tenía motivos para sospechar que existiera tal peligro.

TRABAJADOR EXPERTO—TRABAJADOR ORDINARIO—DEBERES IMPUESTOS POR LA LEY.—El deber que impone la ley a un trabajador experto en casos de accidente es distinto del de un trabajador ordinario.

CAUSA PRÓXIMA DEL DAÑO—ALAMBRES ELÉCTRICOS NO AISLADOS SUFICIENTEMENTE, ABANDONADOS POR VARIOS AÑOS Y CONDUCTORES DE CORRIENTE MORTAL.—Atendidas las circunstancias de este caso y la prueba practicada, *se resolvió* que la acción de la compañía demandada al dejar comunicados, sin necesidad alguna, por más de siete años, los alambres eléctricos de la acometida de la casa en donde ocurrió el accidente, sin cuidarse de aislarlos y en una condición tal que llegaron a trasmitir en vez de una corriente inofensiva como los demás de su clase, una corriente mortal, constituye la verdadera causa próxima e inmediata del daño que se trata de indemnizar.

REVOCACIÓN DE LA SENTENCIA APELADA—DAÑOS Y PERJUICIOS—NEGACIÓN SUFICIENTE DE LOS DAÑOS RECLAMADOS EN LA DEMANDA—FIJACIÓN DE LOS MISMOS POR EL TRIBUNAL DE APELACIÓN.—Cuando, como en este caso, se revoca la sentencia apelada y la parte demandada en su contestación se limita a negar ''la extensión y cuantía de los daños y perjuicios que se alega ha sufrido el demandante,'' tal negación es suficiente, y este tribunal al dictar nueva sentencia a favor de la parte demandante puede fijar el importe que estime justo, sin tener necesariamente que aceptar el montante reclamado en la demanda.

MUERTE POR ELECTRICIDAD—CUANTÍA DE LA INDEMNIZACIÓN.—Demostrando la prueba que la persona que murió en este caso era un hombre de 22 años de

edad, robusto, sobrio, inteligente y activo, que atendía al cuidado y sustento de su familia con el producto de su trabajo consistente en un peso diario, y que dejó al morir dos hijas de corta edad que dependían de él para su sostenimiento, el tribunal estimó que la demandada debía pagar a las indicadas hijas por vía de indemnización la suma de $3,000, debiendo satisfacer además todas las costas, desembolsos y honorarios de abogado.

Los hechos están expresados en la opinión.

Abogado de la apelante: *Sr. José A. Poventud.*

Abogados de la apelada: *Sres. Hartzell & Rodríguez Serra.*

El Juez Asociado Sr. del Toro, emitió la opinión del tribunal.

El presente es un recurso de apelación contra sentencia de la Corte de Distrito de Ponce, dictada en un caso sobre daños y perjuicios.

La demanda se presentó el 6 de marzo de 1911 y se contestó el 15 de abril del mismo año. Señalado día para la celebración del juicio, comparecieron ambas partes y, practicada la prueba de la demandante, la demandada pidió que se sobreseyera el pleito por no ser la prueba aportada suficiente para sostener las alegaciones de la demanda. La moción fué declarada con lugar y el 11 de agosto de 1911 se dictó sentencia desestimando la demanda. La parte demandante apeló entonces para ante este Tribunal Supremo y, tramitado en forma el recurso, fué decidido el 25 de junio de 1912, revocando la sentencia apelada y devolviendo el caso a la corte sentenciadora con instrucciones de que procediera a la celebración de un nuevo juicio de conformidad con los principios enunciados en la opinión emitida al efecto. *Rosado* v. *Ponce Railway and Light Co.,* 18 D. P. R., 609, 651.

Devuelto el pleito a la Corte de Distrito de Ponce, se procedió el 4 de octubre de 1912, a la celebración del nuevo juicio. Ambas partes convinieron en que se diera por reproducida la prueba practicada y así se hizo leyéndose tal como constaba en el pliego preparado para la primera apelación, la parte demandante presentó y practicó su prueba, la parte demandada presentó y practicó prueba de *rebuttal* y el caso

quedó concluso para sentencia que se dictó y registró el 7 de octubre de 1912. Contra dicha sentencia, por la cual se desestimó nuevamente la demanda, se interpuso por la parte demandante el presente recurso de apelación.

La primera cuestión que debe considerarse en este recurso, es la de la exacta situación en que se encontraba la corte inferior al juzgar de nuevo las pruebas practicadas y al aplicar la ley, ya que el apelante en su alegato repetidamente insiste en que dicha corte violó en su declaración de hechos probados la "ley del caso" establecida por esta Corte Suprema en su decisión de 25 de junio de 1912.

La regla aplicable para fijar dicha situación, está claramente establecida por la Corte Suprema de California en el caso de *Wallace* v. *Sisson,* 114 Cal., 43. La corte se expresó así:

"En un juicio anterior de este caso la corte hizo conclusiones de hecho y dictó sentencia por los méritos de las mismas en favor de los demandados. Esta sentencia y una orden denegando una moción del demandante sobre nuevo juicio fueron posteriormente revocadas por esta corte por el fundamento de que ciertas conclusiones de hecho no estaban justificadas por la prueba (*Wallace* v. *Sisson,* 33 Pac. Rep., 496). Celebrado el segundo juicio de la causa, la corte hizo conclusiones de hecho semejantes y volvió a dictar sentencia en favor de los demandados. Contra esta sentencia y orden denegatoria de nuevo juicio, los demandantes han interpuesto apelación. Se alegó por los demandantes en el juicio, y se ha alegado también ante esta corte, que la prueba es substancialmente la misma que se presentó en el juicio anterior, y que la decisión anterior de esta corte en el sentido de que esta prueba era insuficiente para justificar las conclusiones de hecho que entonces examinamos, constituía la ley del caso, y que por ello la corte inferior estaba impedida de hacer las conclusiones que ha hecho ahora, aunque su propio criterio respecto al efecto de esa prueba fuera contrario a la decisión de esta corte. Ambas proposiciones han sido impugnadas por los demandados.

"Una serie no interrumpida de resoluciones que principian con el caso de *Dewey* v. *Gray,* 2 Cal., 374, ha establecido la regla en este Estado de que la resolución de esta corte sobre una cuestión de derecho en un caso apelado ante ella de una corte inferior constituye la ley de este caso, y en adelante, y para todos los procedimientos

subsiguientes de dicho caso, es obligatoria, no sólo para la corte inferior, sino también para esta corte, si volviera el caso ante ella. Nunca se ha resuelto, sin embargo, que las resoluciones de esta corte sobre cuestiones de hecho estén sujetas a esa regla. Por el contrario, frecuentemente hemos resuelto que la regla está limitada en su aplicación a cuestiones de derecho, y no es aplicable a las cuestiones de hecho.''

A la luz de la anterior doctrina, examinaremos las conclusiones de hecho de la Corte de Distrito de Ponce que sirvieron de base a la sentencia apelada y que, copiadas literalmente, son así:

"*Primera*. La corte estima probado que Petra Rosado y Correa estaba legalmente casada con Ramón Rodríguez Vázquez, hoy fallecido, y que ambos son padres de la menor María Luisa Rodríguez y Rosado, la que a su vez es heredera de Ramón Rodríguez Vázquez, en unión de otra hermana menor que no había nacido en la época en que su padre Ramón Rodríguez Vázquez falleciera, ni había nacido tampoco cuando se presentó la demanda que ha dado origen al presente pleito.

"*Segunda*. La corte estima probado que Ramón Rodríguez Vázquez era un hombre de 22 años de edad de constitución robusta y saludable, sobrio, inteligente y activo, y que atendía al cuidado y subsistencia de su familia con el producto de su trabajo, o sea, con un peso diario que ganaba como empleado que fué por espacio de dos años próximamente, de la *South Porto Rico Telephone Company*, de esta Ciudad de Ponce, y que su referida familia, esto es, su esposa e hija, dependían exclusivamente de él para su subsistencia.

"*Tercera.*—La corte estima probado que el día 11 de octubre de 1910, en la calle Real o Carretera de la Playa de Ponce, y frente a la casa No. 28 de dicha calle, había dos alambres eléctricos que conectaban dicha casa con la línea general que suministra corriente eléctrica a las casas particulares para fines de alumbrado, que dichos dos alambres que así conectaban la referida casa estaban con corriente eléctrica de intensidad que no se ha probado fuera mayor de 110 *volts*; que la intensidad de la corriente que ordinariamente discurre por los alambres que suministran corriente a las casas particulares para alumbrado es de 110 *volts;* que la intensidad de la corriente de los alambres primarios, antes de pasar por los transformadores o aparatos propios para reducir la intensidad de las corrientes eléc-

tricas, de los cuales hay dos grandes instalados en el barrio de la Playa, es de 2,220 *volts*; y que es de 500 a 550 *volts* la corriente que discurre por el alambre desnudo que suministra fuerza motriz eléctrica al *trolley,* y el cual alambre pasa por debajo de los alambres eléctricos de la línea principal, que suministran corriente a los que forman la toma o acometida de dicha casa No. 28.

"*Cuarta.* La corte estima probado que como a la una de la tarde del expresado día 11 de octubre de 1910 y en la calle Real o carretera de la Playa, frente a dicha casa No. 28 que es una casa terrera, Ramón Rodríguez Vázquez, que se encontraba tendiendo un línea telefónica, como empleado de la *South Porto Rico Telephone Company,* tomó un alambre de teléfono que se encontraba colgando hacia la calle, y, después de enrollarlo, lo tiró por encima de los dos alambres eléctricos que forman la acometida de la referida casa, y al cogerlo nuevamente, por el otro lado de esos dos alambres, y enrollarlo en una mano y tirar de él con ambas manos, fué levantado violentamente y arrojado contra el balcón de la casa contigua a la No. 28, o sea, la No. 26, recibiendo su cuerpo varias sacudidas fuertes, habiendo retenido el alambre entre sus manos por espacio de unos cinco minutos por no poderse desprender de él, y habiendo encontrado las personas que trataron de auxiliarlo, gran dificultad para poder desprenderle del alambre.

"*Quinta.* La corte estima probado que el alambre del teléfono que tenía en sus manos Ramón Rodríguez Vázquez, en los momentos en que ocurriera el accidente a que se refiere el hecho anterior, estaba en contacto con los alambres eléctricos que forman la acometida de la casa No. 28 y que por virtud de tal contacto se trasmitió por el expresado alambre telefónico una corriente eléctrica de intensidad igual a 110 *volts,* que se comunicó al cuerpo de dicho Rodríguez Vázquez, produciéndole quemaduras, especialmente en ambas manos, que ocasionaron la formación de embolios, sobreviniendo como consecuencia de ellos y gradualmente una parálisis general que fué causa de su muerte, ocurrida en el mes siguiente, o sea en noviembre de 1910.

"*Sexta.* La corte estima probado que el 11 de octubre de 1910, antes de las 12 de dicho día, llovió en la calle Real o carretera de la Playa de Ponce, en donde se encuentran situadas las oficinas de la compañía demandada y la casa No. 28 frente a la cual ocurriera el accidente a Ramón Rodríguez Vázquez, y como consecuencia de ello estima la corte satisfactoriamente probado que el terreno en que se encontraba parado dicho Ramón Rodríguez Vázquez cuando le ocurriera el referido accidente, estaba húmedo.

"*Séptima*. La corte estima satisfactoriamente probado que por razón de la humedad del terreno en que estaba parado Ramón Rodríguez Vázquez disminuyó el número de *ohms* que integraban el poder de resistencia que presenta el organismo humano al paso de las corrientes eléctricas ,y como consecuencia de ello, aumentó la conductibilidad de su organismo, haciéndose sensible a los efectos de la corriente eléctrica, y que en esas condiciones situado, la corriente de 110 *volts* que se trasmitió a su cuerpo por razón de su mayor conductibilidad produjo el inmediato efecto de adherirle al alambre de tal modo que no pudo desprenderse de él, y fué difícil hacerlo a los que le auxiliaron, estando por ese motivo adherido al alambre por espacio de cinco minutos por lo menos, durante los cuales la corriente de 110 *volts* que circulaba por su cuerpo le produjo las quemaduras que fueron causa de las complicaciones que produjeron su muerte.

"*Octava*. La corte estima que no se ha probado en forma alguna, que además del contacto de los alambres de la acometida de la casa No. 28 con el del teléfono que tirara Ramón Rodríguez Vázquez por encima de aquéllos, se hubiera establecido algún otro contacto entre los referidos alambres de la acometida y algún otro alambre que estuviera tendido en aquel sitio y que perteneciera a la compañía demandada.

"*Novena*. La corte estima probado que los alambres que conectaban con la casa No. 28 de la calle Real o carretera de la Playa de Ponce, estaban cubiertos con una capa protectora y aisladora de naturaleza desconocida, la que en algunos sitios se encontraba destruída, observándose en ellos descortezamientos como de dos o tres pulgadas, vistas de cerca, visibles desde la calle, desde donde se observaban como de una pulgada, y que tales descortezamientos o peladuras podían verse con sólo tener el simple cuidado de mirar los alambres con algún detenimiento.

"*Décima*. La corte estima probado que Ramón Rodríguez Vázquez recibió personalmente instrucciones expresas del administrador de la compañía que le tenía empleado, o sea, la *South Porto Rico Telephone Company,* al efecto de tratar y considerar como peligrosos todos los alambres eléctricos que encontrara en la ejecución de sus trabajos como hombre de línea (*lineman*) o empleado de dicha compañía, de considerar todos los alambres conductores como si estuvieren desnudos, de usar siempre sogas largas para tesar los alambres del teléfono con seguridad en todos los casos en que tuviera que tenderlos cruzando alambres eléctricos, de usar tablas para pararse y evitar el contacto con la tierra, cinturones de seguridad y cualquier otro

utensilio 'que la ocasión hiciere necesario y solicitar la ayuda de otros empleados cuando fuere necesaria; y la corte estima probado, además, que la compañía telefónica tenía siempre a disposición de Ramón Rodríguez Vázquez y de los demás empleados todos los utensilios de que pudieran necesitar y valerse para la realización de sus trabajos.

"*Undécima.*—La corte estima probado que Ramón Rodríguez Vázquez se apartó por completo de las expresas instrucciones que recibiera de la compañía del teléfono al ejecutar el tendido en la línea que trataba de llevar a cabo en los momentos en que le ocurriera el accidente, toda vez que estima probado esta corte que dicho Ramón Rodríguez no hizo uso de soga alguna para tirar del alambre del teléfono, ni de tablas para aislarse, ni se ha probado que solicitara ayuda de otros empleados para realizar sus trabajos.

"*Duodécima.* La corte estima probado que Ramón Rodríguez Vázquez tenía conocimiento del peligro que ofrecen los alambres conductores de corrientes eléctricas; estima probado que en el desempeño de su cometido no empleó el debido cuidado y diligencia que debe emplear toda persona que trabaja en un sitio peligroso con conocimiento del peligro y que ni siquiera empleó el que debe observar toda persona de ordinaria prudencia y que dejó de tomar las precauciones que exigía la clase de trabajo que realizaba y las cuales venía obligado a tomar para evitar el peligro.

"*Décima tercera.* La corte estima probado que Ramón Rodríguez Vázquez fué culpable de negligencia contribuyente, y que ésta fué la causa próxima e inmediata del daño que sufriera.

"*Décima cuarta.* La corte estima probado que los alambres eléctricos que conectaban con la casa No. 28 de la Calle Real no suministraban corriente eléctrica a dicha casa; que estuvieron conectados con dicha casa por espacio de siete años, sin suministrar corriente alguna; y que dichos alambres no estaban propiamente cubiertos; y además, estima la corte probado que una persona que transitara por la calle no podía venir en contacto con dichos alambres.

"*Décima quinta.* La corte estima probado que la compañía demandada es culpable de negligencia, y que ésta es de carácter remoto.

"*Décima sexta.* La corte no estima probado que la compañía demandada tuviera conocimiento de los actos negligentes de Ramón Rodríguez Vázquez antes de que sufriera el daño, y por consiguiente, no estima ésta corte probado que la compañía demandada tuviera oportunidad de evitar por el ejercicio del cuidado y diligencia las consecuencias de la negligencia de dicho Ramón Rodríguez Vázquez.''

I. Las conclusiones primera y segunda son aceptadas por la parte apelante y se ajustan enteramente, a nuestro juicio, a la prueba practicada.

II. La fecha del accidente se fija por la corte sentenciadora en sus conclusiones tercera, cuarta y sexta, en el 11 de octubre de 1910. La parte apelante sostiene que la preponderancia de la prueba demuestra que el accidente ocurrió el 10 de octubre de 1910. Todos los testigos de la parte demandante que declararon sobre tal extremo, se refieren al 10 de octubre de 1910 como la fecha en que ocurrió el suceso origen de este pleito y dicha fecha fué aceptada por la corte inferior en sus primeras conclusiones de hecho y por esta Corte Suprema en su decisión de 25 de junio de 1912. Al celebrarse el nuevo juicio, la parte demandada presentó como prueba las declaraciones de los testigos Sres. Palmer y Tous Soto, para demostrar que el accidente había ocurrido el 11 de octubre y no el 10. Palmer, que era un empleado de la compañía telefónica en donde trabajaba Ramón Rodríguez, declaró, en resumen, que el día en que ocurrió el accidente le escribió un carta, que reconoció en el acto de la vista, al Sr. Tous Soto, incluyéndole algunos *reports* acerca del mismo; y Tous Soto, abogado, declaró en resumen, que tuvo conocimiento del accidente por la carta que recibió del Sr. Palmer pidiéndole que investigara el caso, y que inmediatamente se trasladó al hospital en donde estaba el lesionado y habló con él sobre el accidente que le había ocurrido aquel mismo día. Finalmente, refrescando su memoria con la carta, fijó la fecha del accidente en el 11 de octubre de 1910.

La prueba resultó, pues, contradictoria y aun cuando es enteramente cierto que un mayor número de testigos declaró que el accidente había ocurrido el 10 de octubre de 1910, esto no implica necesariamente que la preponderancia de la evidencia demuestre que dicha fecha es la cierta.

"El término preponderancia de evidencia," dice la Corte Suprema de Tennessee, "no significa la mera superioridad numérica de testigos, sino el peso, crédito y valor de la tota-

lidad de la evidencia aportada por cada una de las partes. Si, sin embargo, los testigos son de igual honradez, candor, inteligencia y verdad, y están igualmente corroborados en los otros extremos de sus declaraciones e igualmente libres de interés en el pleito, entonces el mayor número determina la preponderancia.'' *Willcox* v. *Hines*, 100 Tenn., 524, 66 Am. St. Rep., 761.

Esta doctrina está sancionada por la ley en Puerto Rico. El párrafo 2 del artículo 162, de la Ley de Evidencia, dice así:

"El tribunal o jurado no está obligado a decidir de conformidad con las declaraciones de cualquier número de testigos, que no llevaren a su ánimo la convicción, contra un número menor o una presunción u otra evidencia que le convenciere."

En el presente caso el juez sentenciador estimó de más peso la evidencia aportada por la parte demandada y aun cuando tengamos algunas dudas con respecto a su conclusión, en ausencia de una demostración cumplida de que actuó movido por pasión, prejuicio o parcialidad, o de que cometiera un claro y manifiesto error, debemos aceptar su conclusión como la justa y procedente.

III. Sostiene la parte apelante que la corte sentenciadora erró al declarar probado que llovió en el día y en el sitio del accidente y que, como consecuencia de ello, el terreno en que se encontraba parado Ramón Rodríguez Vázquez, estaba húmedo.

Este hecho es importante porque en él se basa la corte sentenciadora para concluir que la corriente eléctrica que pasaba por los alambres de la compañía demandada, era la usual, esto es, no mayor de 110 voltas, y para destruir la aplicación que hizo esta Corte Suprema en su decisión de 25 de junio de 1912, de la doctrina de *res ipsa loquitur.*

La prueba con respecto a este extremo es como sigue:

Los testigos del demandante Quintana, Coll, P. J., Coll, J. V. y Ramos, declararon, el primero: que cuando ocurrió el accidente Rodríguez estaba parado en tierra, que por el

medio de la calle estaba húmedo, porque habían regado, pero donde él estaba parado estaba seco, porque el agua no llegaba hasta allí; el segundo: que el sitio donde Rodríguez estaba parado estaba seco, que en el centro de la calle había humedad, con motivo de haberse regado; el tercero; que el sitio donde el individuo estaba parado, estaba completamente seco, y el cuarto: que el sitio donde Rodríguez cogió el alambre y recibió la sacudida era tierra seca, que la prueba de que estaba seca fué que después que lo sacaron entre todos y a pesar de haberse revolcado en el suelo, no estaba enfangado ni nada, que no tenía fango ni humedad en las manos.

El testigo del demandado, su empleado A. E. Horton, declaró: que tenía el deber de llevar un libro; que el día once de octubre de 1910, estaba en su oficina; que sabe que ese día llovió porque hizo una entrada en el libro; que llovió antes del mediodía, y que la oficina está situada en el camino de la playa.

Entonces la parte demandante presentó los testigos Ramos y Quintana, quienes ratificaron su dicho de que el día del accidente no había llovido en el sitio en donde el mismo ocurrió, dando por razón para recordar tal circunstancia que se empleaban en cubicar y marcar maderas al aire libre, trabajo que no se lleva a efecto en los días que llueve porque se borran las marcas. Declararon además dichos testigos que el sitio en que ocurrió el accidente se considera barrio de la Playa y que muchas llueve en el pueblo de Ponce y no en su Playa.

El juez sentenciador analizó minuciosamente dicha prueba, desechó por increíbles las declaraciones de los testigos de la parte demandante, y, basándose en la del único testigo de la parte demandada, declaró probado el hecho de la lluvia.

El mismo juez en su opinión acepta que no existe prueba directa de que lloviera en el sitio del suceso, pero habiendo declarado el testigo Horton que llovió el día en que ocurrió y que tomó su nota en su oficina que está situada en el camino de la Playa, infiere que debió llover también en el barrio mismo de la Playa.

No podemos aceptar como necesariamente cierta la inferencia del juez sentenciador. La Playa de Ponce se encuentra situada a una distancia considerable del pueblo. Entre ambos corre el río Portugués. Dos testigos declararon que ocurre muchas veces que llueve en el pueblo y no en la playa y su declaración está conforme con la realidad de los hechos. El mismo juez sentenciador, se expresa como sigue:

"Sinceramente declaramos que sobre el hecho que envuelve esta inferencia, o sea, que la casa No. 28 del camino de la Playa estaba comprendida dentro del radio de acción de la lluvia, y aun sobre el mismo hecho de que el día 11 de octubre lloviera, nuestra conciencia no ha quedado tan convencida y tan firme de su existencia, como lo está con respecto a todos y cada uno de los demás hechos que estimamos probados, *que no sean una consecuencia necesaria* de los dos primeros que acabamos de apuntar; pero, sin embargo, nuestra mente no los ha rechazado en absoluto, sino que los ha aceptado satisfactoriamente, y por ello los hemos establecido en nuestras conclusiones."

Siendo este el caso, debemos concluir que no existe un verdadero conflicto en la prueba sobre el extremo de la lluvia y por consiguiente de la humedad del terreno en que se encontraba parado Rodríguez. La prueba de la parte demandada nada demuestra en legal forma, y, por el contrario, la prueba de la parte demandante demuestra que no llovió y que el sitio estaba seco.

La razón que en su opinión consigna el juez sentenciador para no dar crédito a los testigos de la parte demandante, es la de que considera imposible que hubieran podido fijarse en aquel momento de natural excitación, en el detalle de que el suelo estaba seco: Sin embargo, el mismo juez sentenciador da crédito al dicho de los mismos testigos cuando se refirieron al detalle de las peladuras visibles, tamaño de una pulgada, de los alambres de la compañía demandada conductores del fluído que ocasionó la muerte de Rodríguez.

Tal diferencia de apreciación no está justificada. A nuestro juicio, el hecho de declarar los mismos testigos un detalle que puede ser favorable y otro que puede ser adverso a la causa de la parte que los presenta, puede apreciarse más bien

como demostrativo de la verdad de sus manifestaciones en ambos extremos.

Siendo esto así, opinamos que la corte cometió un manifiesto error al declarar probado que estaba húmedo el terreno en que se encontraba parado Rodríguez al ocurrir el accidente.

IV. Sostiene la parte apelante que la corte sentenciadora erró también al declarar probado en la tercera y en la quinta de sus conclusiones, que los alambres con los cuales se puso en contacto el que tenía en sus manos Rodríguez, conducían una corriente eléctrica no mayor de ciento diez voltas.

Examinemos la prueba. Los alambres de la compañía demandada con los cuales se puso en contacto el de la red telefónica que estaba tendiendo Rodríguez, se colocaron a los efectos de dar luz a una casa de vivienda. Un testigo declaró en el juicio que por los alambres colocados con tal propósito sólo pasa una corriente de ciento diez voltas que se obtiene transformando por medio de aparatos apropiados para ello la de mayor tensión que trasmiten otros alambres. Esto está conforme con todos los tratadistas que sobre electricidad hemos consultado.

Basándose en la regla general expuesta por el testigo, y no demostrando la prueba, a su juicio, nada en contrario, la corte sentenciadora llegó a la conclusión que hemos indicado.

Nuestra opinión es distinta. El mismo juez sentenciador en la cuarta de sus conclusiones dice que cuando Rodríguez tiró del alambre, "fué levantado violentamente y arrojado contra el balcón de la casa contigua  *  *  *  recibiendo su cuerpo varias sacudidas fuertes." Y el Doctor Vogel declara que cuando Rodríguez fué llevado al hospital "tenía toda la cara, la frente, la nariz, los brazos, antebrazos, las dos manos, el pecho, el vientre y una pierna llenos de quemaduras; que las quemaduras eran muy profundas especialmente las de las manos y de los antebrazos; que él murió de parálisis producida por embolios y esos embolios fueron producidos por las quemaduras."

¿Puede una corriente eléctrica de ciento diez voltas levantar 'a un hombre robusto violentamente y arrojarlo sobre el balcón de una casa contigua, sacudiéndolo fuertemente, y producirle. como resultado quemaduras tales como las que describe el Dr. Vogel en este caso, y finalmente la muerte?

La prueba pericial de la parte demandante demuestra que no. La prueba pericial de la parte demandada, para concluir que sí tiene que basarse en·la humedad del suelo en que estaba parada la persona a la cual se trasmitió la corriente y ya hemos visto que esta circunstancia no existe en este caso.

Wharton en el tomo 3, págs. 280 y siguientes de su obra sobre Jurisprudencia Médica, dice:

"La reciente introducción de la electricidad de alto voltage en el uso general del comercio ha resultado en un número de accidentes y ·desgracias. La fuerza eléctrica empleada ordinariamente o es una corriente directa con voltage de 110 a 550, o una corriente alternativa de un voltage de 1,100 a 6,000, o hasta de 60,000, para la transmisión a larga distancia como la de las plantas eléctricas de las Cataratas del Niágara. Generalmente las alteraciones o cambios varían de 25 a 100 por segundo. Estas corrientes son transformadas a la energía potencial (ordinariamente baja) en su destino. Los carros eléctricos por lo regular funcionan por medio de una corriente de unos 550; los motores con un voltage de 110 a 550, según las condiciones locales; las luces incandescentes de las casas tienen una corriente de 110 voltas, ya sea ésta directa o alternativa. Las lámparas de arco ordinariamente funcionan con corriente directa dependiendo su voltage del número de lámparas en el, circuito, que a veces llega hasta 5,000 voltas. Los teléfonos y telégrafos con un voltage relativamente pequeño y con un amperage tal que es casi imposible que pueda ocurrir un accidente.

"Los daños que ocasionan estas corrientes por lo regular proceden de los altos voltajes, siendo la corriente alternativa aun cuando el voltage sea reducido, mucho más peligrosa que la directa. Sin embargo, deben exceptuarse las corrientes alternativas excesivamente rápidas de Tesla y Arsonval, con las que pueden aplicarse al organismo humano corrientes de 10,000 a 40,000 voltas sin que se produzca ningún efecto. Las alteraciones de estas corrientes son próximamente de 10,000 a 20,000 por segundo.

"También existe otra cosa que debe tomarse en consideración, o sea, la resistencia que ofrece el cuerpo humano a la corriente. Esta resistencia depende de la eficacia del contacto establecido entre el conductor eléctrico y el cuerpo y la condición de la superficie de este último. Si se encuentra húmeda la superficie del cuerpo debido a la transpiración, o a cualquier solución salina, el cuerpo recibirá entonces mucha más corriente que si la piel estuviera enteramente seca. Además, la resistencia del cuerpo depende de la parte de éste por donde pasa la corriente. Si ésta atraviesa todo el cuerpo, naturalmente que encontrará mayor resistencia que si solo atravesara por una mano. Por tanto, para estar en condiciones de poder expresar el efecto que puede producir determinada corriente en el cuerpo humano, debemos conocer no solamente la clase de corriente sino también las condiciones del cuerpo; y aquella parte del mismo por donde pasa. Entonces podremos apreciar ligeramente el efecto que pueda tener la corriente. En una serie de experimentos practicados con animales con el fin de llegar a conocer el método más conveniente para ejecutar a los criminales, la comisión nombrada por el Estado de New York dió a conocer en su informe los resultados alcanzados por ella, los que mostraban que aquéllos perros cuyo peso era de 10 a 90 libras, ofrecían una resistencia que fluctuaba (no en proporción a su peso) entre 3,600 y 30,000 *ohms;* y en un caso en que el peso del perro fué de 37½ libras, la resistencia era de 200,000 *ohms.* Morían estos animales mediante corrientes alternativas que solamente duraban un instante o de pocos segundos de duración, siendo el voltage de las corrientes de 800 a 140 voltas en los diferentes casos, mientras que en los perros sometidos a la acción de la corriente directa, solamente uno de resistencia de 6,000 no sufrió daño alguno después de haber estado sometido a siete sacudidas eléctricas de un voltage de 1,000 a 1,420 voltas, y a una séptima descarga eléctrica de 1,200 por dos segundos y medio. El perro de 200,000 *ohms* soportó la corriente directa de 304 voltas por espacio de 30 segundos y la alternativa de 100 voltas por sesenta y cinco segundos. Puede calcularse que la resistencia del cuerpo humano es aproximadamente de 10,000 *ohms,* estando sujeta a grandes variaciones de las que dependen los daños recibidos por las corrientes eléctricas. Puede reducirse como en casos de pena capital a 200 o 300 *ohms.*

"Naturalmente que los accidentes producidos por la electricidad tienen lugar en aquellas personas que generalmente se dedican al trabajo de maquinarias y alambres eléctricos, pudiendo contarse entre estos daños desde las quemaduras leves hasta las alternaciones nerviosas o muertes instantáneas. En los siguientes casos los perju-

dicados se han curado de los daños y perjuicios ocasionados por corrientes de alto voltage que por lo general se consideran mortales. Donellan da cuenta del caso de un hombre de cuarenta años que cogió el extremo de un alambre por donde pasaba una corriente de 1,000 voltas. Perdió inmediatamente el conocimiento quedando en un profundo letargo por espacio de media hora, hasta que fué examinado por el médico; su cara estaba pálida y bañada en sudor. Cuarenta minutos después del contacto vomitó, quedando entonces en tal estado de delirio que se hizo necesaria la asistencia de tres hombres para sostenerlo en la cama. Se quejaba y gritaba desaforadamente y tenía fuertes convulsiones que le repetían con frecuencia a pesar de la morfina. Al cabo de unas horas de convulsiones le sobrevino un sueño del cual despertó como a las dos horas siguientes en medio de un aturdimiento y un malestar general. Al día siguiente estaba bien, menos de las quemaduras que aparecían en sus brazos y piernas por donde el alambre se había puesto en contacto con sus ropas aunque éstas no mostraban signo alguno de haber sido quemadas.

"El Sr. Smurthwaite hace un relato acerca de un hombre que ingresó en el cuarto de socorros casi sin conocimiento y sufriendo de fuertes quemaduras en las manos y en el muslo. El hombre tenía muchas llaves en sus bolsillos y se encontraba en posición inclinada con su muslo derecho colocado sobre una guarnición de metal, ajustando con su mano derecha los cepillos de un motor, cuando de pronto sintió la conmoción. Un compañero de trabajo le oyo gritar y al acercarse a él lo encontró pegado a la máquina como con un espasmo producido por tétano; con sus espaldas dobladas o en cierta condición espasmódica (*opisthonos*). Al quitarlo de la máquina su compañero, quedó en el suelo aturdido por unos diez minutos, cuando de repente hizo un ligero movimiento de sus párpados pero sin poder hablar. En sus pantalones se notaba una gran abertura quemada hacia el sitio donde tenía las llaves. Estas parecía que habían sido sacadas de un horno muy caliente. En el muslo tenía una quemadura de forma particular; hacia el centro de la quemadura se veían algunas depresiones que indudablemente correspondían a las cabezas de las llaves y como a dos pulgadas alrededor de esta quemadura la piel se veía muy hinchada y de color rojo obscuro. En la mano derecha recibió fuertes quemaduras. A los dos días se hizo necesario la amputación de la primera falanje del dedo pulgar y el dedo primero. El circuito que causó el accidente era de 2,150 voltas.

"Hedley relata el caso de un ingeniero electricista que casualmente se puso en contacto con un circuito de 3,000 voltas encontrándose

parado en una silla. Manifestó que lo primero que creyó fué que estaba de pie en el suelo. No pudo precisar si saltó de la silla o fué lanzado de ella. Su antebrazo fué a dar contra su pecho cerrándosele la mano. Hacia la parte inferior del codo no había movimiento alguno si bien podía mover el brazo en la parte del hombro. A veces sentía pulsaciones según las alternaciones de la corriente (83 revoluciones por segundo) un poco más arriba del codo y en dirección hacia abajo, que fueron disminuyendo gradualmente regresando lentamente la fuerza motriz al antebrazo. Por tres minutos no sintió nada peor. Pero a los diez minutos siguientes sintió una sensación en sus dedos quedando luego comprobado por un examen que existían quemaduras. El resultado no fué otro sino el de haber expresado el mismo hombre que su estado general de salud era mucho mejor. Haciendo un cálculo del voltage a que quedó sometido el cuerpo del hombre se vió que era de unos 2,500 voltas; la resistencia de su cuerpo de 10,000 *ohms,* y la corriente de 0.25 *ampheres.*

"El siguiente caso es de importancia por el fatal resultado que produjo una corriente de luz alternativa de 100 voltas. Un carpintero que se encontraba arrodillado sobre un tubo de gas tocó con su cabeza accidentalmente un alambre descubierto que iba a una luz que colgaba, mientras hacía ciertas reparaciones en una guardilla. El día era caluroso y él sudaba mucho. Su ropa estaba saturada de sudor. El hombre gritó un poco, tuvo una convulsión y se estiró como si estuviera bajo un espasmo. Un compañero lo quitó del sitio después de unos quince o treinta segundos, y al hacer esto y tocar el alambre recibió una sacudida. El hombre hizo solamente algunos movimientos falleciendo después. La lesión que únicamente recibió fué una lijera quemadura de 3/16 pulgadas de ancho por 2½ pulgadas de largo, sobre el occipucio perforando muy poco la epidermis. El electricista de la ciudad manifestó que la fuerza de la corriente era igual a la de una corriente ordinaria de luces aisladas o para arañas de luces, de 100 voltas, de 50 alternaciones completas, 6,000 del sistema alternativo."

De todo lo transcrito no podemos deducir que exista una regla fija sobre el número de voltas necesario para producir la muerte de una persona, pero sí se desprende, que dicho número debe ser más alto que el de 110, que se considera generalmente inofensivo. Sólo hemos encontrado un caso contrario y es el último a que se refiere Wharton o sea el de la

muerte ocasionada por una corriente de luz alternativa de 100 voltas. Pero véase que la intensidad de la corriente sólo se fijó por la declaración del electricista de la ciudad y, además, téngase en cuenta el sitio de la lesión.

Mientras no se nos demuestre de modo evidente lo contrario, atendidos los efectos que produjo en la persona de Rodríguez, seguiremos opinando que la corriente que pasaba por los alambres de la demandada, era superior a ciento diez voltas y por tanto de mayor intensidad que la usualmente trasmitida para dar luz a la casas de vivienda, y que al no declararlo así, también cometió la corte sentenciadora el manifiesto error alegado por la parte apelante.

V. Sostiene la parte apelante, con razón a nuestro juicio, que la corte sentenciadora erró al declarar probado en la séptima de sus conclusiones que por virtud de la humedad del terreno en que estaba parado Ramón Rodríguez Vázquez, disminuyó el número de *ohms* que integraban el poder de resistencia de su organismo al paso de la corriente eléctrica, debiéndose a tal hecho el que la corriente de ciento diez voltas que pasaba por el alambre de la compañía demandada, pudiera ocasionar los efectos que produjo.

La base en que descansa la conclusión referida no existe y por tanto la conclusión no puede sostenerse. Por el contrario, como sostuvo este tribunal en su opinión de 25 de junio de 1912, las circunstancias del caso hablan por sí mismas, *res ipsa loquitur,* y demuestran, a nuestro entender, que la corriente que levantó a Rodríguez y lo lanzó sobre el balcón de una casa contigua a la en cuyo frente se encontraba y continuó sacudiéndolo y le produjo las quemaduras que se han descrito y finalmente le ocasionó la muerte, era superior a ciento diez voltas.

VI. Sostiene la parte apelante que la corte sentenciadora erró al declarar en la octava de sus conclusiones que no se había probado que los alambres de la acometida de la casa No. 28 se pusieran en contacto con otros alambres de la demandada conductores de corrientes más intensas. A nues-

tro juicio no existe prueba concreta en los autos sobre el particular, pero si las circunstancias demuestran que la corriente que conducían los alambres de la dicha acometida era superior a ciento diez voltas y si la corriente que generalmente conduce esa clase de alambres en de ciento diez voltas, entonces tuvo necesariamente que ocurrir que los transformadores de la demandada no funcionaran en aquel instante, o que los alambres de la acometida estaban en contacto de algún modo con los otros de mayor tensión de la misma demandada que es la única que en aquel sitio trasmite, para los fines de la explotación de su línea de carros, corrientes eléctricas de alta tensión.   De todos modos, dada la forma violenta de la muerte de Rodríguez, opinamos que la doctrina de *res ipsa loquitur* era aplicable al caso y que el demandado era quien estaba en la obligación de probar que no había sido negligente.

VII. Sostiene la parte apelante que la corte sentenciadora erró al declarar probado en la novena de sus conclusiones, que los alambres de la demandada estaban descortezados, siendo sus descortezamientos visibles desde la calle.

Hemos examinado cuidadosamente la prueba practicada y no obstante lo que en contrario aparece en la opinión de esta corte de 25 de junio de 1912, debemos decidir que la conclusión de la corte sentenciadora en este extremo es enteramente correcta.

VIII. Sostiene la parte apelante, con razón a nuestro juicio, que la corte sentenciadora erró al declarar probado en la décima y undécima de sus conclusiones, que la compañía telefónica en la cual estaba empleado Rodríguez dió a éste las necesarias instrucciones con respecto a la manera de realizar su trabajo y especialmente al hecho de tratar como peligrosos los alambres eléctricos que encontrara en la ejecución del mismo.

De la prueba no aparece claramente que se hubieran dado a Rodríguez instrucciones específicas.   El administrador de la compañía telefónica que declaró, confiaba evidentemente en su práctica general de dar tales instrucciones.   Rodríguez fué

un trabajador ordinario antes de ser un reparador de líneas *(lineman)*. La ocasión adecuada para darle las instrucciones, hubiera sido al conferírsele el empleo de reparador de líneas, pero el administrador no recordó con precisión esa época, ni ninguna otra especialmente, no obstante haber sido interrogado sobre el particular. La instrucción dada en términos generales por el administrador con respecto a que debía tenerse presente que todos los alambres eran peligrosos, no puede por sí sola hacer culpable de negligencia contributoria a un reparador de líneas, si éste al encontrarse con un alambre tenía motivos bastantes para creer que no era peligroso. Finalmente diremos que del examen que hemos hecho de la prueba, no podemos deducir que en efecto se dieran instrucciones precisas a Rodríguez para evitar el contacto con los alambres eléctricos, ni menos que la compañía insistiera en que se cumplieran las instrucciones en la forma en que fueron dadas.

Además, la Corte Suprema de Massachusetts, en el caso de *Mahan* v. *Newton, & Boston Street Railway,* 189 Mass. 1, 5, ha dicho:

"La regla de que los reparadores de líneas deben tratar a todo alambre como si fuera un alambre con corriente, fué establecida en interés de ellos mismos y para su seguridad, así como en interés de la compañía, y tuvo por objeto fijar una norma general de conducta entre los hombres que trabajan con los alambres de la compañía. Sería ir demasiado lejos el decir que, en ningún caso y bajo ninguna circunstancia, estaría un reparador de línea justificado, a causa de esta regla, en considerar a un alambre como sin corriente. Eso sería hacer de la regla misma un tipo concluyente de negligencia, no siendo más que una circunstancia que debe ser considerada junta con otras."

IX. Y sostiene, por último, la parte apelante que la corte sentenciadora erró al declarar probado: (*a*) que Rodríguez fué culpable de negligencia contributoria, (*b*) que su negligencia fué la causa próxima e inmediata del daño que sufriera, (*c*) que si bien la demandada fué negligente, su negligencia sólo puede estimarse como de carácter remoto, y (*d*) que la

demandada no tuvo oportunidad de evitar por el ejercicio del ciudado y diligencia, las consecuencias de la negligencia de Rodríguez.

Muchos aspectos de estas cuestiones fueron considerados extensamente en la vista anterior de este caso en la opinión emitida por el juez Sr. MacLeary. Estamos de acuerdo con la corte inferior al declarar que la compañía demandada no tuvo oportunidad de evitar el peligro que había para Rodríguez después que se colocó en una situación peligrosa y por tanto que la doctrina sentada en los casos de *Davies* v. *Mann,* 10 M. & W., 546, *Inland and Seaboard Coasting Co.* v. *Tolson,* 139 U. S., 551 y 558, y en algunos de los otros casos citados en nuestra anterior opinión, 18 D. P. R., 609, 647, no es aplicable. Los demás principios establecidos en dicha opinión, continuan siendo la ley del caso. Aclarado este punto, proseguiremos nuestro análisis.

En primer lugar, la obligación de probar la negligencia contributoria incumbe al demandado. Es una cuestión de defensa. Esta es la regla en la Corte Suprema de los Estados Unidos, en las Cortes Federales y en las cortes de la mayoría de los Estados. Es una regla más sabia que aquélla que impone la obligación al demandante y su sabiduría ha sido aprobada por Thompson en su obra sobre Negligencia, párrafo 366, y por otros autores.

Es verdad que en el caso de *Díaz* v. *The San Juan Light & Transit Co.,* 17 D. P. R., 69, 81, dijimos que en casos de esta naturaleza bastará que "se pruebe que se sufrió por el demandante, ocasionado por la culpa y negligencia de la demandada y no por su culpa o negligencia, un daño efectivo," y que el anterior pasaje unido a lo consignado en el No. 2 del resumen de los principios fundamentales envueltos en la opinión hecho al final de la misma y en la letra *b* del tópico: "Extremos que deben ser alegados y probados," del sylabus, pudiera interpretarse en el sentido de haberse resuelto por esta corte que incumbe al demandante alegar y probar la falta de negligencia contributoria. En dicho caso nuestra atención

estuvo fija en el resultado de la prueba en general y no fué nuestra intención poner el cargo de la prueba de la falta de negligencia contributoria, en el propio demandante. Más como la forma en que aparece redactada la opinión pudiera dar lugar a dudas, creemos conveniente aclarar nuestro criterio. En lo sucesivo, el dicho caso de Díaz debe aplicarse en relación con lo expuesto en éste de Rosado. Por lo que respecta a la influencia que nuestra decisión en el caso de Díaz hubiera podido tener en la actitud asumida por la parte demandada en este pleito, diremos que en modo alguno aparece que dicha parte fuera inducida a error, ya que ella, de acuerdo con la verdadera doctrina, alegó como defensa en su contestación la negligencia contributoria de la persona por virtud de cuya muerte se reclama. Además, tomando en consideración los hechos que se han probado, creemos que era al demandado a quien incumbía demostrar que Rodríguez había procedido sin el debido cuidado.

La corte inferior hizo un completo análisis del caso de de *Clements* v. *Louisiana Electric Light Company,* 44 La. Ann., 692; 16 L. R. A., 43, que ha sido citado y considerado en nuestra anterior opinión. Thompson, en su obra sobre Negligencia, párrafo 188, al tratar de la regla relativa al hecho de encontrarse una persona debido a su descuido, con peligros conocidos, expresa que ''la verdadera significación de la regla, es, por tanto, que para que pueda imputarse negligencia contributoria a una persona que se arriesga al peligro, debe dicha persona arriesgarse (1) a sabiendas, o con desconocimiento negligente, y (2) voluntaria y (3) innecesariamente.'' Y el caso en que se funda principalmente el autor para llegar a esa conclusión, es el de Clements ya citado. No puede imputarse negligencia a una persona porque no investigue sobre el peligro, si de acuerdo con las circunstancias del caso no tenía dicha persona motivos para sospechar que hubiera tal peligro. Thompson sobre Negligencia, párrafo 188; 29 Cyc., 514, 515; *Missouri Pac. Ry. Co.* v. *John-*

*son,* 77 Pac., 576; *Clements* v. *Louisiana Electric Light Company,* arriba citado.

Según expresamos en nuestra opinión anterior, Rodríguez solamente había estado trabajando ocho meses como reparador de líneas telefónicas, no constando de la prueba que fuera un reparador experto. En realidad no sabemos que hubiera tenido anteriormente alguna vez que manejar un alambre peligroso. No existe prueba alguna ante nosotros de que los alambres de teléfonos sean peligrosos y no se probó que los alambres de la compañía telefónica pasaran por encima de los del alumbrado eléctrico de la compañía en alguna otra parte de la ciudad de Ponce. No sabemos que Rodríguez en alguna otra ocasión anterior hubiera pasado algún alambre sobre otros alambres peligrosos. En los autos nada consta con respecto a su experiencia o conocimientos como reparador de líneas. En cuanto a su deber de observar si había peligro, en nada se diferenciaba Rodríguez de cualquier otro trabajador ordinario. Se le ordenó que reparara el alambre del teléfono y actuaba dentro de la esfera de sus obligaciones como tal empleado. De la prueba aparece de modo claro e inequívoco que por la clase de alambres que le produjeron la muerte, pasaba por regla general la misma corriente que va y se usa en cualquier casa. Nada aparece de los autos que demuestre que tuviera algún motivo para sospechar que existiera peligro alguno o que en alguna forma pudiera ocasionar la muerte. Y aun cuando hubiera tenido la obligación de mirar si el alambre no estaba aislado y hubiera visto que en efecto no lo estaba, lo más que podía temer si se lanzaba a pasar el alambre telefónico por encima, era alguna sacudida de la corriente. Solo en el supuesto de que estaba obligado a preveer la negligencia en que posiblemente pudiera incurrir la compañía, podría decirse que Rodríguez tenía la obligación de hacer pesquisas acerca del peligro, y ésto no es generalmente la ley. Thompson sobre Negligencia, párrafo 180.

La corte inferior en su conclusión duodécima declaró probado que Rodríguez tenía conocimiento del peligro que ofrecían las corrientes eléctricas. No vemos que se haya probado que Rodríguez tuviera ningún conocimiento del peligro en el sitio en que precisamente se encontraba trabajando, o motivos para tener algún temor. El deber que impone la ley a un reparador experto, es distinto del de un trabajador ordinario. Thompson sobre Negligencia, párrafos 5734, y siguientes. Pero no había razón alguna para que cualquier reparador de líneas experto abrigara temor de que por los alambres de que se trata en este caso pasara una corriente que produjera la muerte, dadas las circunstancias que concurren. Sin embargo, según hemos dicho repetidas veces en nuestras dos opiniones, no se probó que Rodríguez fuera un reparador experto.

Conviene hacer referencia a algunos casos análogos en los que se ha resuelto que no ha habido negligencia contributoria por parte del demandante.

En el caso de *McCabe* v. *Narragansett Electric Lighting Co.,* 26 R. I., 427, se instaló la luz de acuerdo con las instrucciones del finado y la instalación que se hizo era para una corriente de 104 voltas solamente. Se resolvió que no establecía diferencia alguna el hecho de que fuera defectuosa la instalación, pues el finado solamente había convenido en que la corriente fuera de bajo voltage. Se admitió incidentalmente en ese caso que una corriente de 104 voltas no sería peligrosa aun cuando la persona que la usara estuviera parada sobre un piso húmedo.

En el caso de *Paine* v. *Electric Illuminating Co.,* 64 App. Div. Report, New York 477, se resolvió que no podía decirse que el finado fué negligente al andar con los alambres del telégrafo por no llevar guantes de goma, si no se prueba que esa era la práctica corriente en tales casos o que el finado sabía o debió haber sabido al ejercitar cuidado que una corriente eléctrica de alta tensión había sido comunicada a cualquiera de los alambres del poste donde se encontraba trabajando.

En el caso de *Phelan* v. *Louisville Electric L. Co.*, 6 L. R. A. (N. S.), 459, la corte resolvió que un empleado que se encuentre en un edificio alumbrado por electricidad tiene razón en creer, a falta de aviso en sentido contrario, que el transformador y demás aparatos para suministrar electricidad están en buen estado y sin defectos.

En el caso de *Hodgkins* v. *Bay City*, 156 Mich., 687; 132 A. S. R., 546, se sostuvo la instrucción de no haberse llamado al finado a examinar los alambres eléctricos del demandado para ver si estaba bien aislados, pero que tenía derecho a creer que lo estaban; y que a menos que el jurado declarara probado que el peligro de los mismos era tan manifiesto que debió haber llamado su atención y ser visto por él de haber procedido con cuidado ordinario, no podía alegarse que el finado tenía conocimiento del peligro sino solamente de aquel peligro que podría resultar de un alambre debidamente aislado; y que su grado de cuidado debe estar en proporción con su experiencia y conocimiento de los peligros de los alambres o de otro modo será culpable de negligencia contributoria.

Un examen general de las autoridades demuestra que la opinión emitida por este tribunal en el caso anterior es la correcta, o sea, que a no ser que se pruebe de algún modo el conocimiento, experiencia o aviso para que una persona pueda tomar las medidas de precaución necesarias, no puede imputársele negligencia contributoria cuando realiza su trabajo en la forma ordinaria o más conveniente. Véase también el caso de *Card* v. *Wenatchee Valley Gas & Electric Co.*, 137 Pac., 1047.

En el caso de *White* v. *Reservation Electric Co.*, 134 Pac., 807, se resolvió que los derechos que tienen las personas en sus casas son ilimitados a falta de señales de peligro. Aunque no declaramos que los derechos de este reparador de alambres eran iguales a los de una persona en su casa, sin embargo el principio tiene alguna aplicación si se tiene en cuenta que

la corriente usada en este caso era igual a la usada por cualquier dueño de casa en la ciudad de Ponce.

En resumen, a virtud de todo lo expuesto, no podemos llegar a la conclusión de que el accidente origen de este pleito, se deba a la negligencia contributoria de Ramón Rodríguez Vázquez.

Por el contrario, la acción de la compañía demandada al dejar conectados sin necesidad alguna, por más de siete años, aquellos alambres eléctricos, sin cuidarse de aislarlos y en una condición tal que llegaron a transmitir en vez de una corriente inofensiva como los demás de su clase, una corriente mortal, estimamos que constituía y seguimos estimando que constituye la verdadera causa próxima e inmediata del daño que se trata de indemnizar.

Habiendo llegado a las anteriores conclusiones, se impone la revocación de la sentencia apelada.

La parte apelante sostiene que en el caso de que esta corte llegara a la conclusión de que debía revocar la sentencia, debía también, de acuerdo con el artículo 306 del Código de Enjuiciamiento Civil, enmendado en 1906, Leyes de 1906, p. 25, proceder a dictar la que debió haber dictado la corte de distrito.

Y sostiene la parte apelante además, que debemos fijar la indemnización en la exacta suma reclamada en la demanda, ya que ésta es jurada y la parte demandada en su contestación se limitó a negar "la extensión y cuantía de los daños y perjuicios que se alega ha sufrido la demandante," citando en su apoyo la siguiente jurisprudencia:

"En una acción por daños y perjuicios, una negación en la contestación de que el demandante ha sufrido daños en la exacta suma reclamada en la demanda, es insuficiente." *Huston* v. *T. & C. C. T. R. Co.,* 45 Cal., 550.

"No conteniendo la contestación una negación específica del montante de los daños alegados en la demanda, las alegaciones de la misma sobre tal extremo deben entenderse admitidas, no existiendo por tanto controversia con respecto a ellas." *McLaughlin* v. *Kelly,* 22 Cal., 212, 223.

"En una acción sobre '*trespass,*' cuando no existe una negación específica del montante de los daños alegados en la demanda aunque la alegada causa de los daños esté especialmente en controversia, en dudoso si la contestación puede estimarse como una negación de los daños." *Rowe* v. *Bradley,* 12 Cal., 227.

Sin embargo, atendidas las circunstancias de este caso, no siendo los citados enteramente iguales al presente, y existiendo también la doctrina de que "cuando la acción se presente por daños ilíquidos, una contestación que contiene una negación general al par que una negación especial de que el demandante haya sido perjudicado en el montante reclamado, ha sido estimada suficiente para poner la cuestión de los daños en controversia," *Conway* v. *U. S.,* 95 Fed., 615, 37 C. C. A., 200, 13 Cyc., 182, notas 61 y 62, opinamos que la corte no está obligada a fijar la indemnización en la exacta suma reclamada en la demanda. Si dicha suma es la justa de acuerdo con el mérito de las pruebas debe aceptarse, pero si no lo es, debe rebajarse en la forma que fuere procedente.

A nuestro juicio, habiendo en consideración que, según se declaró probado por la corte inferior, Ramón Rodríguez Vázquez era un hombre de veinte y dos años de edad, robusto, sobrio, inteligente y activo, que atendía al cuidado y sustento de su familia con el producto de su trabajo, o sea, con un peso diario que ganaba, dependiendo su familia exclusivamente de él para su subsistencia; opinamos que la indemnización que debe satisfacerse por la demandada a las hijas de Ramón Rodríguez Vázquez, de acuerdo con el artículo 61 del Código de Enjuiciamiento Civil, no debe ser menor de la suma de tres mil pesos.

Por virtud de todo lo expuesto, debe revocarse la sentencia apelada y condenarse a la demandada a pagar a las dos hijas de Ramón Rodríguez Vázquez habidas en su matrimonio con Petra Rosado y Correa, la indicada suma, con más las

costas, desembolsos y honorarios de abogado que se justifiquen.

> *Revocada la sentencia apelada y dictada nueva sentencia a favor de la demandante por $3,000 con costas, desembolsos y honorarios de abogado.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf y Aldrey.

El Juez Asociado Sr. Hutchison no formó parte del tribunal en la visto de este caso.