ELVIRA JUANA MANUELA JOAQUINA GARCÍA FERNÁNDEZ, demandante y apelada, *v.* JOSEFA AGUAYO Y GRACIELA GARCÍA, demandadas y apelantes.

No. 3898.—*Sometido:* Abril 9, 1928. *Resuelto:* Febrero 4, 1929.

*José Tous Soto,* abogado de las apelantes; *R. Sancho Bonet,* abogado de la apelada.

El Juez Asociado Señor Texidor, emitió la opinión del tribunal.

Éste es uno de los litigios más antiguos en Puerto Rico. Pudiéramos empezar esta decisión con palabras parecidas a las que se emplean en la dictada por este Tribunal en el caso *García et al.* v. *Aguayo et al.,* 32 D.P.R. 422, que es realmente este mismo litigio. Dícese allí:

"Desde hace cerca de veinte años la demandante en este pleito está luchando porque se le reconozcan sus derechos como hija legítima de Don Juan García Villarraza y de su esposa Doña Manuela Fernández y Rodríguez. *Aguayo et al.* v. *García,* 11 D.P.R. 274; *García* v. *Aguayo et al.,* 29 D.P.R. 1022."

Salvo la diferencia en las fechas, o sea, el haber transcurrido cinco años después de que se dijo esto, en los demás particulares conviene repetir ese párrafo para iniciar esta opinión.

La demandante, alegando que don Juan García Villarraza falleció en 27 de abril de 1899, casado entonces con doña Josefa Aguayo, y siendo sus únicos herederos la demandante, la otra hija Graciela García y la viuda doña Josefa Aguayo; y habiendo muerto intestado el padre, sostuvo en sus alegaciones que tenía la condición de hija legítima de don Juan García Villarraza y de doña Manuela Fernández, unidos en matrimonio anterior al celebrado con doña Josefa Aguayo, habiendo fallecido la madre de la demandante en la época indicada en la demanda. Pidió la demandante que se declarara su condición de hija legítima y de heredera de don Juan García Villarraza, y que se anulara la declaratoria de herederos hecha por la Corte de Distrito de Ponce a favor de Graciela García y doña Josefa Aguayo, como únicas herederas de don Juan García, así como sus consecuencias legales en cuanto a los bienes de la herencia y transmisión de los mismos y en cuanto a la percepción de frutos, rentas y utilidades, y asimismo en cuanto a la compra de determinados bienes adquiridos por la demandada Josefa Aguayo con renta producida por el caudal hereditario.

Las demandadas contestaron negando la calidad de hija legítima de la demandante y negando los demás hechos esenciales y los daños y perjuicios; y alegando asimismo la prescripción, la pendencia de otro pleito, y otras defensas.

Visto el pleito ante la Corte de Distrito de Ponce, dictó ésta sentencia en fecha enero 27 de 1926, declarando con lugar la demanda en cuanto a la condición de hija legítima de la demandante Elvira Juana Manuela Joaquina García Fernández, y nula la declaratoria de herederos hecha a favor de las demandadas y las inscripciones llevadas a cabo en el registro de la propiedad en cuanto a las fincas de la herencia del causante Sr. García Villarraza, ordenando una nueva partición de bienes con colación del importe de frutos y rentas, para cuya determinación se daban quince días, y condenando también a las demandadas al pago de intereses sobre el importe de los frutos.

Contra esta sentencia se entabló la presente apelación.

La parte apelante, o sea, doña Josefa Aguayo y doña Graciela García, ha presentado un alegato cuidadoso y minucioso, producto de serio estudio de la materia.

De los quince señalamientos de error, que por la parte apelante se presentan, pueden hacerse grupos diversos, trayendo a cada uno de ellos los que pertenecen a una sola clase.

Así, encontramos que pueden hacerse objeto de un solo grupo, los siguientes señalamientos:

"1. La Corte erró al admitir en evidencia la certificación del asiento reconstruido por el cura de Guira de Melena (Cuba) del supuesto matrimonio de los padres de la demandante, como evidencia de dicho matrimonio.

"6. La prueba del matrimonio presentada no se ajusta a lo dispuesto en el Código Civil y por ende se ha infringido por la Corte el artículo 53 del Código Civil al admitirse en evidencia de un supuesto matrimonio canónico celebrado antes de regir el Código Civil la certificación de un acta reconstruida de dicho matrimonio.

"7. La Corte erró al no exigir previamente a la admisión de la certificación de un asiento reconstruido de un supuesto matrimonio, como prueba supletoria, del asiento original por destrucción del libro

en que constaba, evidencia de la pre-existencia de dicho asiento en el libro destruido o establecimiento de una presunción de que dicho asiento debía existir en dicho libro destruido.'' ╲

█ █ █ Estos tres señalamientos se refieren a la admisibilidad del documento partida de matrimonio canónico de Juan García Villarraza y Manuela Fernández. Este documento es el mismo que se presentó en el juicio anterior en este mismo pleito, y que no fué admitido por la corte de distrito. Este Tribunal Supremo, en la decisión, por mayoría, en el caso *García et al.* v. *Aguayo,* 32 D.P.R. 422, citó las objeciones que ante el inferior se hicieron a la admisión del documento, en esta forma:

'' 'Tenemos que hacer una larga objeción a este documento y vamos a dictársela al taquígrafo.˙ Realmente ésta es la cuestión más importante del juicio. Nos oponemos a la admisión de este documento:—Primero: Porque no es una transcripción del asiento original de la celebración del matrimonio obrante en el archivo parroquial correspondiente, extendida por el ministro celebrante conjuntamente con la celebración del matrimonio en cumplimiento de su cargo, en el curso de su empleo o ministerio.—Segundo: Porque dicho asiento original (entry) del matrimonio en el libro correspondiente al expedirse la certificación, no existía y sin justificarse que hubiera existido alguna vez, que después desapareció o fué destruída, ˙caso único en que sería admisible prueba supletoria o secundaria, de acuerdo con el artículo 154 y 350 del Código Civil y artículo 24 número 1 de la Ley de Evidencia no puede ser admisible.— Tercero: Porque la supuesta reconstrucción del asiento en el libro de matrimonio no ha sido hecha por autoridad competente, que en este caso lo sería el obispo, en adecuado procedimiento, sino que es un nuevo asiento extendido en un libro provisional de matrimonio el dos de octubre de 1918 después de fallado el pleito anterior entre las mismas partes y sobre los mismos *issues* que el presente, que lo fué en 25 de abril de 1908 y pocos días antes de comenzarse el presente pleito en 7 de noviembre de 1918, habiéndose confeccionado dicho documento en el extranjero por un sacerdote que no celebró ni asistió al supuesto matrimonio de que se trata, ni era párroco de Güira de Melena a la sazón, sin que firme ningún testigo de dicho matrimonio o persona que lo presenciara, ni se diga la fuente de información del sacerdote reconstructor, o confeccionador, ni se haya oído o dado oportunidad de ser oídas las partes interesadas, ni apa-

rece la autoridad de dicho sacerdote para extender el nuevo asiento.—Cuarto: Porque dicho documento no es sólo *hearsay* de la peor clase, sino un *self-serving evidence*, confeccionada después de este litigio entre las partes sobre el hecho preciso que trata de probarse con esta evidencia de reciente confección o sea de dos de octubre de 1918, habiéndose expedido certificación al día siguiente de confeccionada, o sea el tres de octubre.—Quinto: Porque la certificación de dicho documento no se ajusta en su forma al artículo 69, número 8 de la Ley de Evidencia.—Sexto: Porque en la fecha que se dice celebrado el matrimonio estaba vigente en Cuba la Ley de Registro Civil y desde esa fecha no era admisible para probar el matrimonio, otra prueba que la certificación del Registro Civil y aún cuando se hubiera celebrado antes el matrimonio de regir dicha ley, de acuerdo con las disposiciones vigentes entonces, los asientos de los libros parroquiales debieron transcribirse a los libros del Registro Civil.' "

Y este Tribunal Supremo, dijo:

"A nuestro juicio la corte de distrito erró al negar la admisión del documento y su error aparece aún más claro cuando se considera el testimonio de Florencio García, un sacerdote, conocedor del Derecho Canónico, a quien no la demandante sino la propia demandada Sra. Aguayo encomendó que averiguara personalmente si la reconstrucción de la partida del matrimonio de los padres de la demandante se había hecho conforme a las leyes canónicas. Declaró que conocía personalmente al párraco Luciano García y vió la partida original asentada en el libro supletorio formado a virtud del incendio del archivo en tiempos de la última guerra de Cuba con España. No se permitió al testigo que expresara su opinión, ni que describiera el expediente del cual había emanado la partida reconstruida, pero a pesar de la tenaz oposición de la parte demandada y de la actitud de la corte, de su declaración aparece la existencia del expediente visto por él."

Y luego, en la misma página que se acaba de citar, dijo el tribunal:

"Se ha insistido en que sólo al Obispo de la Diócesis a que pertenecía la parroquia, correspondía la reconstrucción de la partida. Estamos enteramente conformes en que es el Obispo la primera autoridad de la Diócesis y la única que puede ordenar la reconstrucción de archivos parroquiales destruidos, y así resulta del documento de que se trata en este caso. En él se dice: 'Y en cumplimiento del decreto del Exmo. Sr. Obispo Diocesano de fecha 23 de junio de

1896, por haberse quemado el archivo de esta iglesia el día cinco de énero de este año noventa y seis, yo, presbítero Luciano García y González, Cura Párroco interino de la misma, lo firmo a dos de octubre de 1918.' Y la certificación expedida por el párroco fué al Obispado y en el Obispado se legalizó su firma por el funcionario con autoridad para ello.''

Y en la página 429, tomo y decisión citados, encontramos:

''No se ha citado por ninguna de las partes ni hemos podido encontrar nosotros el texto exacto de la ley canónica que fija la norma que debe seguirse para reconstruir los archivos parroquiales destruidos por incendio o cualquier otra causa, y siendo ello así debe presumirse que la orden del Obispo se dictó de. acuerdo con la ley y de conformidad con ella fué cumplida. Una vez que el libro supletorio fué formado y las partidas destruidas quedaron nuevamente inscritas en él, sus asientos tienen la condición de originales y el funcionario que los custodia puede expedir certificaciones válidas. Toca a la parte demandada demostrar la ineficacia del documento, si es realmente ineficaz de acuerdo con los hechos y la ley. *Prima facie,* repetimos, es válido y debió admitirse y reconocérsele todo el valor que las leyes y la jurisprudencia reconocen a los documentos de igual naturaleza.''

En realidad, con lo dicho en aquella decisión, *García et al.* v. *Aguayo et al.,* se encuentran resueltos los tres señalamientos de error de que aquí se habla, y la resolución contiene estas declaraciones:

1. El asiento certificado en el documento de que se trata, tiene las condiciones de un asiento original.

2. La certificación está expedida por un funcionario que tiene bajo su custodia los libros en que se hallan esos asientos y que pudo expedirla válidamente.

3. La reconstrucción del archivo parroquial de que se trata fué hecha por decreto eclesiástico del Obispo de la Diócesis correspondiente.

4. La presunción legal es de que en la reconstrucción y en la expedición del certificado se siguió la ley.

Las objeciones que en aquel caso se hicieron, con res-

pecto a la admisibilidad del documento, fueron en realidad desestimadas, al declararse el documento admisible como evidencia.

Cotejando y comparando los puntos de objeción en aquel y en este caso, encontramos que son substancialmente iguales, siquiera varíe la forma de presentarlos, y de exponerlos. Anotamos que algunos de los supuestos defectos que se señalan a la certificación de matrimonio, se encuentran también en certificaciones que presentaron las ahora apelantes, como el documento número dos, páginas 69, 70 y 71, transcripción, referida a unos autos sobre nulidad de asiento de matrimonio, y en la que se certifica en la misma forma que en el antes citado documento, tanto por la autoridad eclesiástica como por el funcionario consular; y lo mismo en la certificación que aparece de las páginas 74 a 78, transcripción.

Los tres señalamientos de error de que se trata, deben ser resueltos negativamente, de acuerdo con la antes citada decisión.

■■ El segundo señalamiento de error, se halla redactado como sigue:

"2. La sentencia es errónea por ser contraria a la ley del caso, contenida en la doctrina sentada por esta Hon. Corte en pleito entre las mismas partes sobre el mismo asunto que originó el presente (Aguayo v. García, 11 D.P.R. 274) porque la certificación del asiento de un supuesto matrimonio canónico reconstruido por el párroco de Guira de Melena (Cuba) en procedimiento ex-parte, no constituye prueba del matrimonio de los padres de la actora."

Cierto que en el caso *Aguayo et al.* v. *García* se dictó por este tribunal la sentencia que aparece en el tomo 11, D.P.R. páginas 274 a 287. De los documentos que en prueba fueron presentados por la demandada doña Elvira García Fernández, da cuenta la decisión, y ellos aparecen ser los que siguen:

"Las pruebas traídas al juicio a instancia de la demandada Doña Elvira fueron las siguientes:

"1. Certificación de la partida bautismal de Doña Elvira, idén-

tica en sus contextos a la unida a la demanda, y adicionada con la legalización del Consulado General de los Estados Unidos en la Habana, cuya legalización, que tiene fecha 14 de julio de 1905, expresa que el padre Gumersindo Rodríguez tiene a su cargo los archivos de la iglesia de Nuestra Señora de Guadalupe en la ciudad de la Habana.

"2. Certificación de la partida de matrimonio canónico de Don Juan García Villarraza y Doña Josefa Aguayo y Casals, celebrado en la ciudad de Ponce en 28 de noviembre de 1891, en cuya partida se hizo constar que Don Juan García Villarraza era viudo de Doña Manuela Fernández."

En la decisión en ese caso no se trata de la certificación de la partida de matrimonio de don Juan García Villarraza con doña Manuela Fernández, que no fué presentada: basta ver la fecha de tal certificación, 2 de octubre de 1918, para comprender que no pudo ser presentada en aquel pleito, resuelto en apelación en 30 de junio de 1906.

En esa decisión se trata de la fuerza probatoria de algunas manifestaciones contenidas en las partidas de bautizo de doña Elvira, y de matrimonio de don Juan García Villarraza y doña Joseña Aguayo, y se dice lo que sigue:

"Las partidas de bautismo de Doña Elvira y de matrimonio de Don Juan García Villarraza con Doña Josefa Aguayo, como en general, todos los documentos, hacen fe del hecho que motiva su otorgamiento y de la fecha de éste o sea de la administración del bautismo y de la celebración del matrimonio en las fechas que expresan; pero no de la veracidad de las manifestaciones que en ellas se inserten respecto de la filiación o estado del bautizado o casado. Esa es la doctrina legal derivada de sentencias del Tribunal Supremo de España de 28 de junio de 1864, 18 de marzo de 1873, 24 de junio de 1897 y 13 de julio de 1899, doctrina conforme con el precepto del artículo 1186 del Código Civil vigente. La verdadera prueba de la filiación legítima de Doña Elvira en caso como en el presente en que se ha traído a judicial debate esa filiación, debe ser la justificación del matrimonio de sus padres en forma admisible en derecho, y en términos que no dejan duda racional de ella. La declaración de Doña Elvira y el testimonio de Don Esteban Vidal Ríos sobre manifestaciones que le hiciera Villarraza no demuestran legalmente la filiación legítima de aquélla." 11 D.P.R. 274, 287.

Pero, en la decisión en *García* v. *Aguayo,* 32 D.P.R. 422, se completaron los conceptos, y se citó el caso *Ex parte Otero et al.* y *Striker* v. *El Pueblo,* 27 D.P.R. 340, el caso *Tardi* v. *Tardi,* 30 D.P.R. 225–231, y el caso *Sison* v. *Ambalada,* 30 Jur. Fil. 131, en los que se tratan los efectos de ciertas declaraciones en esos documentos, y los de la corroboración por otros medios de prueba. En el caso *Tardi* v. *Tardi, supra,* encontramos que al tratarse de varias partidas bautismales, de matrimonio y de defunción, que fueron admitidas, este tribunal dice:

"Basta la enunciación de los anteriores documentos para deducir su pertinencia en un caso de esa naturaleza. Es claro que cada uno de por sí no prueba todo lo que era necesario probar, pero analizados en conjunto, y en armonía con las declaraciones de los testigos establecieron el caso de las promoventes."

Conviene recordar que en el mismo caso *Tardi* v. *Tardi,* que venimos citando, hay, en la opinión, dos párrafos que se hallan redactados así:

"El matrimonio de Juan Tardi con María Antonia Ramírez de Arellano debió de haberse celebrado hace más de ochenta años y el de Juan Adolfo Tardi con María Dolores Muñiz hace más de cuarenta. En la partida de bautismo de Tomasia extendida en el año 1840 se hace constar que es 'hija legítima de don Juan Francisco Tardi y de doña María Antonia Ramírez de Arellano, cónyuge de esta feligresía.' En la de defunción de Juan Tardi, 1889, se hizo constar que era viudo, casado en primeras nupcias con doña María Antonia Ramírez de Arellano y que dejó como sucesores a sus hijos legítimos 'Rosalía, Adela y Adolfo Tardi y Ramírez.' En las partidas de defunción de Rosalía, y de bautismo, 1845, y defunción, 1898, de Adolfo, existen las mismas referencias a su condición de hijos legítimos del Sr. Tardi y la Sra. Ramírez. En su testamento, otorgado en 1888, Tardi dice que fué 'casado y velado conforme a los ritos de nuestra santa madre iglesia católica, en primeras nupcias con doña María Antonia Ramírez de Arellano, con la que tuvo y procreó tres hijos que existen y se llaman Rosalía, casada con don Pedro Martínez, Adela, casada con don Antonio Franccioni, y Adolfo, que es viudo.' Y en la división de la herencia de don Juan, en la que intervino el opositor como hijo natural del mismo, se

partió de la base de dicho matrimonio. En cuanto al enlace legítimo de Adolfo Tardi con María Dolores Muñiz a él se hace referencia en las partidas de bautismo de María Edelmira, 1878, y Eugenia Amelia, 1882, y en la de nacimiento de María Ernestina, las tres promoventes. En esos documentos no sólo se consigna quiénes son los padres, si que también los abuelos siendo éstos el Sr. Tardi y la Sra Ramírez. Además dos testigos declaran sin objeción con respecto a la condición de las promoventes como hijas legítimas de Adolfo Tardi y Ramírez.

"A la luz de los principios establecidos en el caso de *Ex parte Otero et al y Striker* v. *El Pueblo*, 27 D.P.R. 340, es necesario reconocer que la prueba aportada es suficiente para demostrar que Tomasia, conocida por Adela Tardi y Ramírez y Adolfo Tardi y Ramírez eran hermanos y que las promoventes son hijas legítimas de Adolfo y en tal virtud legítimas sobrinas de Tomasia, sin que sean obstáculo para ello las decisiones de esta Corte Suprema invocadas por el apelante y dictadas en los casos de *Aguayo et al.* v. *García*, 11 D.P.R. 275; *Sucesión Díaz* v. *Sucesión Díaz*, 17 D.P.R. 57, y *Dupont* v. *Aybar*, 25 D.P.R. 317. Las circunstancias concurrentes eran distintas."

Márcase así la doctrina de este tribunal. Y en la decisión en *García* v. *Aguayo*, 32 D.P.R. 422, queda más fija tal doctrina, o cuando menos, sus consecuencias prácticas, al afirmarse que

"Repetidamente se ha establecido que los documentos de tal naturaleza sólo constituyen prueba plena del acto que motiva su otorgamiento, pero no puede negarse que en casos apropiados las manifestaciones en dichos documentos consignadas tienen también su fuerza probatoria."

Distínguese así entre la prueba plena con relación al hecho que motiva el otorgamiento, y la calidad de elemento probatorio parcial y concurrente, en cuanto a ciertas manifestaciones y con respecto a ciertos hechos, relacionados con ellas, o de ellas dependientes. La primera, suficiente por sí para determinar ciertos extremos; y la segunda, insuficiente en sus elementos aislados, pero bastante, en unión de otras pruebas, para fundar un juicio relativo a hechos determina-

dos, o para servir de base a deducciones lógicas que puedan servir a determinar una creencia.

No creemos que pueda llamarse "ley del caso," con relación al presente, lo decidido en *Aguayo* v. *García,* 11 D.P.R. 274; entre otras razones, porque los elementos de juicio en aquel caso no fueron los mismos del presente. Allí no se presentó el certificado de matrimonio de Don Juan García Villarraza y doña Manuela Fernández; allí se trató de la apreciación de las manifestaciones contenidas en ciertas partidas de bautismo y de matrimonio, de las inferencias que de esas manifestaciones se pudieran extraer, y de la esfera y las limitaciones de tales inferencias. Pero, de todos modos, en la opinión en el caso de *Tardi* v. *Tardi, supra,* y en la en el caso *García* v. *Aguayo,* 32 D.P.R. 422, la manera de ver este problema, ha sido claramente expuesta; y esta última decisión citada, es la que podría tener la condición de "ley del caso." Se ha declarado en muchos casos por la Corte Suprema de los Estados Unidos, y por las Cortes de Circuito, y Cortes Supremas de los Estados, que la decisión en apelación o en error, es la ley del caso en un juicio subsiguiente cuando los hechos o la evidencia son substancialmente los mismos. (Véase American Digest, 1907 to 1916, 2nd Dec. Ed. Volume 2, Key Number 1195, 1.)

Como una cuestión de derecho, se decidió por este tribunal, en el caso *García* v. *Aguayo,* 32 D.P.R. 422, que, una vez formado por reconstrucción el libro supletorio, e inscritos de nuevo en él las partidas destruidas, los asientos tienen la condición de originales, y el funcionario que los custodia tiene facultad legal para expedir certificación válida, siendo tal certificación admisible, y debiéndosele reconocer la eficacia que la ley y la jurisprudencia dan a las de su clase. Consecuencia lógica y jurídica de esta declaración, es la de que la certificación de que se trata, es admisible como prueba. La cuestión del peso de tal evidencia es distinta. Y eso debe estimarse "ley del caso", en cuanto a si es, o no, prueba la referida certificación. A este propósito, es de recordar

aquí, lo declarado por este tribunal en la decisión en el caso *Rosado* v. *Ponce Ry. and Light Co.*, 20 D.P.R. 564, en que se cita el caso *Wallace* v. *Sisson*, 114 Cal. 43.

No existe el segundo error señalado por la parte apelante.

■■ En otro grupo pueden resumirse y estudiarse los señalamientos de error que aparecen bajo los números 4, 5 y 6, del alegato de las apelantes. Su texto es como sigue:

"4. La Corte infringió la Ley de Evidencia no sólo al admitir, sino al dar efecto probatorio alguno a la referida certificación.

"5. La Corte erró, en la hipótesis de que tal certificación fuera admisible en evidencia y tuviera algún efecto probatorio, al admitirla y darle efecto contra tercero que no fué parte en el expediente de reconstrucción.

"6. La prueba del matrimonio presentada no se ajusta a lo dispuesto en el Código Civil y por ende se ha infringido por la Corte el artículo 53 del Código Civil al admitirse en evidencia de un supuesto matrimonio canónico celebrado antes de regir el Código Civil la certificación de un acta reconstruida de dicho matrimonio."

Si el documento de que se trata es admisible como evidencia, y debe dársele la misma eficacia y valor que a todos los de su clase, según se decidió por este tribunal en el caso antes citado, *García* v. *Aguayo*, no hay que hacer un largo estudio del argumento en este particular. Está ya decidido: y no hay tal error. Y en cuanto a que tuviera o no efecto contra tercero, sería preciso crear esta calidad de tercero en cuanto a los herederos de Don Juan García Villarraza, que la sucedieron en derechos, acciones y obligaciones, para sostener el supuesto error.

En la argumentación con respecto a este extremo, se parte de supuestos que no pueden admitirse como fundamentos para resolver. Se habla de la suposición de que el expediente de reconstrucción se hubiera tramitado en forma, y que existiera el decreto del Obispo, aprobando y ordenando la transcripción. No puede sostenerse la argumentación en esa forma. Mientras otra cosa no se pruebe, la presunción es

que la ley fué observada, y sus mandatos cumplidos: la presunción es que el expediente se tramitó en forma. Aunque no es base de nuestra decisión, hay un documento que aparece en este expediente, aunque no en la exposición del caso, que es una certificación expedida por el Notario Mayor del Arzobispado de la Habana en 18 de diciembre de 1926, en donde aparece que por el Arzobispo de la Habana, se dictó en 4 febrero de 1926 sentencia en un expediente incoado por doña Josefa Aguayo y Carols sobre nulidad de asiento matrimonial de Don Juan García Villarraza y Doña Manuela Fernández Perdigan, verificado en la Parroquia de Guira de Melena en dos de octubre de 1918, declarando que la partida matrimonial de los citados es auténtica conforme a derecho, y goza de toda fe que corresponde a los documentos de su clase. Esta certificación aparece unida a los autos de esta apelación, aunque no en la transcripción, por lo que no se le da el carácter de fundamento de esta opinión. Es indudable que el procedimiento que debió seguirse por doña Josefa Aguayo, o por cualquier persona que creyera que la certificación, la partida o su reconstrucción son nulas, es el de atacar ante el tribunal competente tal documento, y obtener su declaración de nulidad y no el de declarar la nulidad, como argumento para el litigio.

No encontramos que la sentencia del Tribunal Supremo de España, de 6 de diciembre de 1901, tenga aplicación al caso. Desde luego la sentencia no tiene autoridad obligatoria para los tribunales de Puerto Rico; pero como consulta o ilustración tendría peso si hubiera paridad entre el caso allí resuelto y el que tenemos ante nosotros. En el caso allí resuelto hay un matrimonio *que consta únicamente por decreto del Vicario Eclesiástico*.

No existe, como tal, el error señalado bajo el número 5; como por las mismas razones expuestas al tratar de éste, y de otros señalamientos, no convenimos con la existencia del señalado bajo el número 6.

■ Parece que, al argumentar la parte apelante el séptimo

señalamiento de error, hay alguna confusión. Trátase de la necesidad de demostrar la previa existencia del asiento destruido, para poder presentar la certificación que se refiere al libro supletorio; así aparece del señalamiento de error. Pero, en la argumentación, se separa la apelante del enunciado del error, y trata de la posibilidad de que Juan García Villarraza y Manuela Fernández contrajeran matrimonio en Guira de Melena, y de si este matrimonio hubiera sido írrito y nulo, citándose el artículo 75 del Código Civil Español, y un comentario de Scaévola con relación a cánones del Concilio de Trento, con referencia a la intervención, en el matrimonio, del párroco propio, y al impedimento constituido por el previo estado de adulterio; y a la nulidad de los matrimonios canónicos contraídos bajo uno de esos impedimentos, de los llamados dirimentes.

Pero nos confrontamos con esta situación: En primer lugar, el régimen del artículo 75 del Código Civil Español, no puede aplicarse a este matrimonio de Juan García Villarraza y Manuela Fernández, que, según la certificación, se contrajo en 1883, antes de la vigencia del Código Civil Español, que se hizo extensiva a Cuba y Puerto Rico, por Real Decreto de 31 de julio de 1889, fijándose en él el plazo para que empezara a regir.

En cuanto a la existencia de impedimentos dirimentes, y consiguiente nulidad del matrimonio, creemos que para declarar tal nulidad debe ejercitarse una acción; y en la contestación no encontramos otra cosa que la negación de que García Villarraza fuera casado con Manuela Fernández, y la afirmación de que al tiempo de la concepción y del nacimiento de Rodulfo Manuel Abraham, era García Villarraza casado con Cármen Beltrán. Esto no basta. La alegación de la nulidad de un matrimonio debe hacerse en forma explícita y clara, y expresarse los hechos fundamentales de tal nulidad, dando a la otra parte la oportunidad de defenderse y probar.

La acción de nulidad de matrimonio no se ha

ejercitado en este caso. Y mal podría ejercitarse por razón del previo estado de adulterio de los que luego contrajeron el matrimonio, porque a su ejercicio serían obstáculo dos motivos principales: 1º. Que, si se tomara como régimen el del Código Civil, de acuerdo con el apartado 7º. del artículo 84 del Español, copiado en el apartado 5º. del artículo 132 del de Puerto Rico, están incapacitados para contraer matrimonio entre sí los *adúlteros que hubieran sido condenados por sentencia firme*. (Itálicas nuestras.) Y sin esa declaración judicial, y esa sanción penal, no existía la incapacidad. Aparte de esto, si se sigue el Código Civil Español, y si lo que en este caso hubo fué un matrimonio canónico, el pleito de nulidad, mientras rigió el citado código, estaba, por virtud de lo dispuesto en sus artículos 80 y 103 fuera de la jurisdicción de los tribunales civiles. 2º. Que en cuanto a la autorización del matrimonio por un párroco que no fuera el propio de los contrayentes, tenía que haberse alegado y probado tal hecho. No fué tampoco la interpretación de la ley canónica, tan rígida como parece suponerse, y así lo demuestra el decreto sobre esponsales y matrimonio publicado por la Sacra Congregación del Concilio, de 2 de agosto de 1907, al tratar de la intervención del párroco dice:

"V—Asisten lícitamente:

"  *       *       *       *       *       *       *

"2. Constándoles, además, el domicilio, o cuando menos, la residencia, durante un mes, de cualquiera de los contrayentes en el lugar del matrimonio."

De forma que la simple residencia, por un mes, en el lugar del matrimonio, era bastante para dar al párroco jurisdicción como tal y como propio. Esta disposición, aunque posterior a la época del matrimonio canónico de que se trata, revela el espíritu de la interpretación canónica.

De todas maneras, se ofrecería el problema de si aquel matrimonio, en el caso de que en un procedimiento propio, se hubiera declarado nulo, y de mala fe en su contracción, no produciría efecto civil en cuanto a los hijos habidos en

él. Si nos atenemos al Código Civil Español, que aquí se ha citado por la parte apelante, su artículo 69 sostiene que el matrimonio contraído de buena fe, produce efectos civiles, aunque sea declarado nulo; si hubo buena fe de parte de uno de los cónyuges, produce efectos civiles con relación a él y a los hijos; y si hubo mala fe por los dos cónyuges, produce efectos civiles con respecto a los hijos. El Código Español, en parte siguió, y en parte amplió la doctrina en que estaba informada la Ley de Matrimonio Civil de 1870. De acuerdo con los artículos 94 y 95 de ésta, el matrimonio nulo contraído de buena fe produce los efectos civiles mientras subsiste, y la legitimidad de los hijos; y en el caso de buena fe de parte de uno de los cónyuges, los produce con respecto a él, y a los hijos. El código, fué más allá que la Ley de Matrimonio Civil, y en el artículo 69, más ajustado a invariables principios de justicia que a preceptos de necesidad legislativa, declaró que en los casos en que en la contracción del matrimonio con vicio de nulidad, hubiera mala fe por parte de ambos cónyuges, el matrimonio surtiría efectos civiles respecto a los hijos.

Comentando este artículo 69 del Código Civil Español, ha dicho Scaévola:

"Siendo la buena fe el requisito determinante de los efectos civiles del matrimonio que se declara nulo, la ley tenía que establecer una regla sobre la existencia o no existencia de esa cualidad, y al efecto, fija el principio de que la buena fe se presume mientras no conste lo contrario. Hay que probar que ha existido mala fe: en tanto que esto no se demuestre, se considera contraído el matrimonio de buena fe. Por ésta se entiende en el caso actual la ignorancia o el desconocimiento de la causa que motiva la nulidad. ¿De qué efectos habla el artículo? De todos los que produce un matrimonio válido, pero solamente mientras subsista el matrimonio nulo, pues declarada la nulidad, los efectos de ésta son los expuestos en los artículos 70, 71 y 72. Más claro era el artículo 94 de la Ley de Matrimonio Civil, que decía: 'Producirá todos sus efectos civiles mientras subsista.'

"Estos efectos, que se refieren, ya a la persona, ya a los bienes, varían según los casos que comprende el artículo.

"Cuando la buena fe existe en ambos cónyuges, los hijos son legítimos y los padres poseen la patria potestad. . . .

"Si la buena fe no existe más que en uno de ellos, los hijos tendrán también la condición de legítimos, pero la patria potestad será facultad exclusiva del inocente. . . .

"Si la mala fe es de ambos cónyuges, el matrimonio sólo surtirá efectos civiles respecto de los hijos: esto es, serán legítimos, y gozarán de todos los derechos que la ley reconoce a esta clase de hijos."

Según afirma la parte apelante, de la partida no consta la vecindad de Don Juan García, y sí que Doña Manuela Fernández es de "esta feligresía." Pero afirma la apelante, que no aparece probado ese extremo. No creemos que en la partida matrimonial deba aparecer la prueba de la vecindad o la residencia de los contrayentes; ése es un hecho que en la partida sienta el párroco, que se ha cerciorado previamente de ello; pero no tiene que probar el mismo.

Este señalamiento de error se argumenta fuera de su enunciación, es decir, incluyéndose causas y razones distintas.

Creemos innecesario estudiar aquí los que se refieren a la posesión de estado, y cuando ello puede ser prueba del matrimonio, una vez que hemos declarado en cuanto a la partida matrimonial y sus efectos; y lo mismo en lo que atañe a la presunción *juris tantum* establecida por la Ley de Evidencia de que dos personas que se conducen como casados lo son en realidad.

En cuanto al error noveno, se enuncia así:

"La Corte erró al no dar por probada la buena fe con que han poseído las demandadas la casa en cuestión, hasta el momento de ser presentada la demanda en este caso."

Dado el testimonio en este caso, especialmente las declaraciones de las demandadas, y recordando que en la certificación del matrimonio de Don Juan García con Doña Josefa Aguayo, se expresó que el Sr. García era viudo de Doña Manuela Fernández, fallecida en 24 de mayo de 1891, nos parece muy difícil sostener que las demandadas ignoraran la

posibilidad de los derechos de la demandante, y poseyeran en la creencia de que no existía derecho alguno adverso al de su total posesión de los bienes de la herencia de Don Juan García Villarraza. Notamos, sobre todo, la contestación de Graciela García (página 54, transcripción) en la que, refiriéndose a la demandante, dice que la testigo la tenía como hermana, y que ahora la tiene como su hermana de padre, lo mismo que a él (Rodolfo) lo tiene como hermano de padre.

No existe el error señalado bajo el número *noveno*.

No fué tampoco error de la corte inferior la desestimación de la defensa de *litis-pendencia*. Cuanto se refiere a esta defensa se halla resuelto en la decisión de este tribunal en el caso *García et al.* v. *Aguayo et al.*, 32 D.P.R. 422, donde se dijo:

"Y con el mismo fin consignaremos que, a nuestro juicio, carece de mérito la defensa de *litis-pendencia*, y las cuestiones de tercero y prescripción." Pág. 425, tomo citado.

El siguiente señalamiento de error se formula así:

"La Corte erró al no resolver (asumiendo la posesión de mala fe de las demandadas) sobre los frutos y rentas devengadas por la casa, los gastos abonables a las demandadas y el balance correspondiente a la demandante, y al condenar a las demandadas a pagar a la demandante, en concepto de daños y perjuicios, el interés de los frutos que deban reintegrar."

De la parte de la opinión de la corte, que se copia en las páginas 53 y 54 del alegato de la parte apelante, se ve claramente la situación. Dice:

"En cuanto a los frutos que se reclaman, no tenemos una base segura para poder determinar el importe y cuantía de los mismos, tanto porque ellos dependen de la cuota hereditaria que pueda asignársele a la demandante en la partición, cuanto porque de la prueba practicada en este juicio no tenemos una base segura para poder determinar el importe total de tales frutos o rentas. La demandante alega que la casa citada en la demanda ha producido unas veces de 75 a 100 pesos y actualmente 200 y pico de pesos. La de-

mandada nos ha presentado una cuenta creditiva de los ingresos y egresos de la administración de dicha finca, cuenta que no ha sido aceptada por la demandante en su fondo, y si bien se ha ofrecido por la representación de las demandadas el traer los recibos y comprobantes de dicha cuenta y testigos para sostener la misma, esa prueba no ha venido ante nosotros, y de ahí que no podemos llegar a una conclusión final en el asunto, y creemos procedente en bien de la justicia que se haga una liquidación completa de dichos frutos para determinar la cuantía de los mismos, adjudicándose a la demandante la parte que de ellos pueda corresponderle de acuerdo con su participación hereditaria. Cuya liquidación deberá llevarse a cabo dentro de los 15 días de ser firme esta sentencia, en cuyo acto deberán presentarse por la demandada los correspondientes comprobantes y prueba pertinente, al objeto de determinar con la mayor certeza el importe total de tales frutos. (Véase el caso de *Cintrón et al* v. *Banco Territorial y Agrícola,* 15 D.P.R. 536.)—En cuanto a los daños y perjuicios, tampoco tenemos prueba para fijar su montante, si bien entendemos que la demandante debe obtener de las demandadas el interés legal de la suma que la corresponda en concepto de frutos, a contar desde el fallecimiento del señor García Villarraza hasta su definitivo pago.''

No tiene la corte elementos suficientes para establecer una liquidación que no sea expuesta a error, y ordena que se practique. Ése es el derecho perfecto de la corte. Y en lo que afecta al pago de intereses de la cantidad que a la demandante pueda corresponder, es cierto que la reclamación de la demandante fué por $22,800 en concepto de daños y perjuicios, y la corte le concede los frutos y sobre su montante, intereses al 6 por ciento anual.

Realmente, aún mirada a la luz del artículo 1075 del Código Civil, esta parte de la sentencia es de imposible justificación. El pago de las cantidades, que de la liquidación resulten, es lo único que puede concederse. No cabe dar el interés de sumas que no se habían pedido en su tiempo, y que aún no se conocen. Conviene recordar a este propósito lo dispuesto en el artículo 1067 del Código Civil de Puerto Rico, en cuanto a la mora.

Convenimos en la existencia de error en cuanto al extremo concreto de la condena en intereses de los frutos.

▌ Con relación al señalamiento de error número 12, entendemos que no hay tal error.

El señalamiento es éste:

"La Corte erró al dejar de resolver expresamente la acción de la demandante reclamando ciertas casas construidas por la demandada con frutos de la casa hereditaria y al imponer las costas a las demandadas."

Refiriéndose a la falta de resolución en cuanto a la acción de la demandante reclamando ciertas casas construidas por la demandada con frutos de la herencia, es a primera vista, algo que llama la atención el que no sea la demandante la que se queja de esta falta de resolución, y sí las demandadas. En verdad, si éstas lo hacen, parece ser porque desean despejar definitivamente las situaciones próximas y futuras. Pero, una vez que la corte ha concedido los frutos, la concesión de la otra petición de la demandante, sería de evidente injusticia.

De las citas que en el alegato se hacen al argumentar este error, se viene a un exacto conocimiento de la posición del juez de la corte inferior, quien al resolver acerca de la petición de declarar de modo expreso sin lugar la tercera causa de acción, con respecto a bienes adquiridos por Doña Josefa Aguayo con rentas de la herencia, dijo:

"En relación a la segunda cuestión, entendemos que el hecho de que la Corte no haya hecho pronunciamiento alguno en su sentencia con respecto a dichos extremos, da por supuesto el que la misma ha sido declarada sin lugar sobre tales particulares."

▌ Hay en este señalamiento un segundo extremo: el de la imposición de costas. Se funda la parte apelante en varios motivos. El primero de ellos es que se desestimó la tercera causa de acción: o sea la misma de que se viene hablando en este señalamiento, y que parece admitirse que fué resuelta. Como otros argumentos se aduce que las deman-

dadas descansan en sentencias de este tribunal; que ellas han procedido de buena fe; y que las cuestiones que en este litigio se presentan son nuevas y de difícil solución.

No vemos que las sentencias de este tribunal, si se refieren las apelantes a los pleitos entre ellas, ni el auto de declaratoria de herederos, alienten, o autoricen a sostener litigios, ni excusen la tenacidad de éstos o de cualesquiera otros litigantes; ni encontramos fundamento para sostener que la buena fe de las demandadas sea evidente. Y en lo que toca a las cuestiones legales nuevas y de difícil solución, la experiencia autoriza a creer que, en cada litigio la misma ley y el mismo precepto legal puede, a la luz de los hechos y de las circunstancias, aparecer susceptible de ofrecer facetas y luces distintas; pero, en la realidad, el principio legal, en su esencia, es el mismo siempre, y es siempre invariable.

No vemos que se ataque de abuso de discreción judicial, o de manifiesto error, parcialidad, prejuicio, o resultado de influencia o de pasión, la decisión del tribunal inferior en cuanto a las costas.

Declaramos que no existe el error que bajo este número se señala.

No encontramos el argumento respecto al señalamiento décimotercero, que se enuncia así:

"La Corte erró al rechazar como evidencia la certificación del Provisor del Obispado de la Habana para probar la costumbre en dicho Obispado de decretarse la reconstrucción del asiento de una partida matrimonial sin perjuicio de tercero y la certificación del nacimiento de la supuesta hija de Juan García Villarraza y Carmen Beltrán llamada Sara."

Dos errores más se señalan, bajo los números décimo cuarto y décimo quinto, argumentados como uno solo. Dicen así:

"14.—La Corte erró al admitir la certificación de defunción de Don Juan García Villarraza para probar que era casado.

"15.—La Corte erró al admitir que el testigo Piña declarara sobre el concepto público de las relaciones de los padres de la actora."

Entendemos que la resolución de este caso no se ha fundado en el hecho relacionado en la partida de defunción de que se trata; y en cuanto a la declaración del testigo Sr. Piña, que se relaciona en la exposición del caso, en las páginas 48 a 53, en la que hubo el interrogatorio directo, y el contrainterrogatorio por la parte demandada, no hemos encontrado allí las objeciones al testimonio, y las excepciones necesarias, y sí en cambio el contrainterrogatorio amplio y detallado. Aparece de un pliego de excepciones lo que sigue:

"8.—El demandado formuló una moción para que se eliminara la declaración del testigo José C. Piña a lo que se negó la Corte, y el demandado tomó excepción."

Entendemos que la objeción debe formularse y la excepción, tomarse, con expresión de los fundamentos, de ese modo la corte tiene una oportunidad de evitar un error, y las partes la de argumentar, y sostener o retirar la prueba. No aparece la base de la objeción y de la excepción; y no podemos declarar que se formularan y tomaran correctamente.

No existen los errores señalados bajo estos números.

*Por las razones que quedan expuestas, la sentencia dictada en este caso debe confirmarse, menos en cuanto se refiere a la condena por intereses de los frutos, parte única que se revoca.*

Los Jueces Asociados Señores Wolf y Aldrey disintieron en cuanto a la confirmación. (Véase el prefacio.)